**In re INTERCO SYSTEMS, INC., Debtor.**

**C. Bruce LAWRENCE, Trustee, Plaintiff,**

**v.**

**BONADIO, INSERO & CO.; Insero & McLaughlin; Bonadio & Company; George J. Archibald; Thomas F. Bonadio; Peter Ciaccia; Joseph F. Hurley; Frank A. Insero; Richard A. Krucher; Ronald A. Ricotta; Mario P. Urso; James J. Zielinski; Elliot, Stern, Calabrese & Higgins; Richard J. Elliot; Herbert M. Stern; Richard A. Calabrese; and William M. Higgins, Defendants.**

Bankruptcy No. 93–20144.
Adv. No. 95–2084.

United States Bankruptcy Court,
W.D. New York.

Nov. 1, 1996.

the extent that the claim of the "creditor against the debtor is disallowed." 11 U.S.C. § 553(a).

Scott R. Hatz, Bond, Schoeneck & King, Syracuse, NY, for Plaintiff.

Eileen E. Buholtz, Connors & Corcoran, Rochester, NY, for Defendants.

## DECISION & ORDER

JOHN C. NINFO, II, Bankruptcy Judge.

### BACKGROUND

On January 26, 1993, three "Supplier" creditors of the debtor, Interco Systems, Inc. ("Interco"), filed an involuntary Chapter 7 petition alleging that Interco was not paying its debts as they became due. Interco inter-

posed an answer, claiming that the indebtedness alleged by each of the petitioning creditors was in dispute, and requested that the petition be dismissed. At a pretrial conference on March 16, 1993, Interco indicated that it wished to remain in the Bankruptcy Court and attempt to reorganize under Chapter 11. Because Section 706(a) gives a Chapter 7 debtor acting in good faith the absolute right to convert to Chapter 11 if the case has not previously been converted, counsel for the petitioning creditors and Interco agreed to discuss Interco's desire to proceed in Chapter 11 as an alternative to conducting a trial of the issues under Section 303(h). To afford the parties time for such further discussion, a trial on the involuntary petition was scheduled for April 2, 1993. On April 1, 1993, a stipulation between Interco and the petitioning creditors was filed with the Court. The stipulation agreed that Interco would go forward with a voluntary Chapter 11 case. After some procedural matters were corrected, the case went forward in Chapter 11 with January 26, 1993 deemed to be the order for relief date.

On June 14, 1993, the Creditors Committee formed in the Chapter 11 case filed a motion pursuant to Section 1112(b) which requested that the Interco case be converted to a Chapter 7 case, or, in the alternative, that a trustee be appointed pursuant to Section 1104(a) (the "Conversion Motion"). Full day evidentiary hearings were held on June 18, 21, 23, 28 and July 9, 1993, and oral argument by counsel was presented on July 14, 1993, at which time the Court reserved on the Conversion Motion.

By a written decision issued on July 19, 1993 the Court determined that the Interco Chapter 11 case should be converted to a Chapter 7 case for cause, and thereafter on July 21, 1993 the designation of the Office of the United States Trustee appointing C. Bruce Lawrence as Trustee (the "Trustee") was filed with the Court.

Interco's business can best be described as a buying group. In the late 1970's and throughout the 1980's, it organized "Subscribers," generally small to medium wholesale or retail distributors of electrical and plumbing supplies located all across the country, and placed orders on their behalf with "Suppliers," manufacturers or national wholesalers of plumbing and electrical supplies. Because Interco made such large purchases with the Suppliers, it was able to negotiate volume sales discounts ("VSD's") with the Suppliers, between 1% and 13% of purchases, which were then split between the Subscribers and Interco. Interco was also providing Suppliers with greater market penetration, since they might not otherwise obtain orders from many of the Interco Subscribers, which further justified the payment of VSD's. Although during this period, in many if not most cases, orders were actually placed directly by Subscribers with the Suppliers and the goods shipped directly to the Subscribers, nevertheless, Interco was paid for the goods by the Subscribers and it was Interco that was billed by and paid the Suppliers. As a result, during the 1980's when there were very few, if any, defaults in payment by Subscribers, Interco was able to generate substantial profits from its share of VSD's, sign-up fees paid by new Subscribers and the significant "float" on monies received by Interco from the Subscribers before the Suppliers' invoices were due. In its best year, 1989, Interco handled purchases of in excess of $264,000,000, generating income before taxes of in excess of $2.9 million. After 1989, the recession hit, building was down nationwide, the volume of purchases decreased, and Subscribers began defaulting on their payments to Interco. However, Interco was still legally obligated to pay the Suppliers for the goods, it was not earning as much on the float, and it failed to react quickly to the change in the business environment and reduce its expenses. As a result, before taxes, Interco lost in excess of $2,000,000 in 1990 and $3,000,000 in 1991.

In 1992 Interco began trying to negotiate contracts with Suppliers which would provide that although the Suppliers would now bill and receive payment directly from the Subscribers, they would still pay the VSD's to Interco, which Interco would continue to divide between it and the Subscribers. Under these contracts Interco would not have any credit risk in connection with purchases, but it would also no longer be supplying credit

support to the Suppliers, an element of value which at least some of the Suppliers had relied heavily upon.

In January, 1995 the Trustee commenced in excess of 350 separate adversary proceedings to recover alleged avoidable preferences, post-petition transfers and fraudulent conveyances. Among these adversary proceedings was this Adversary Proceeding against Bonadio, Insero & Co., Interco's former accountants, and its general partners, as well as Elliot, Stern, Calabrese & Higgins (the "Calabrese Firm"), Interco's former attorneys, and its general partners. In his Complaint, the Trustee included causes of action: (1) under Section 547, to recover, as avoidable preferences, prepetition payments made by Interco to the defendants for professional services rendered; (2) under Section 548, to recover, as avoidable fraudulent conveyances, prepetition payments made by Interco to the defendants for professional services rendered for which the Trustee alleged Interco received less than a reasonably equivalent value; and (3) under Section 549, to recover, as avoidable post-petition transfers, payments made by Interco to the defendants for professional services rendered pre-petition and paid post-petition.

On March 22, 1996, an Order was entered approving a settlement of the Adversary Proceeding against the defendants Bonadio, Insero & Co. and its general partners.

After a number of pre-trial conferences were conducted by the Court and a Motion and Cross–Motion for Partial Summary Judgment settled, the remaining issues in the Adversary Proceeding against the Calabrese Firm and its general partners were tried before the Court on July 24, 1996. At that time the Court reserved decision and allowed the parties until August 23, 1996 to file any additional submissions.

By the time of trial, the parties had narrowed the issues and stipulated to many of the facts, so that the only issues which remained for the Court to decide were: (1) whether Interco's payment of $6,200.00 in March, 1993, a date after the filing of the involuntary petition but before an order for relief was entered in April, 1993, for prepetition professional services rendered by the Calabrese Firm between January 5, 1993 and January 22, 1993 and billed in February, 1993, when the Firm was still acting as Interco's attorneys, was an avoidable post-petition transfer under Section 549(a); (2) whether $5,100.00 paid to the Calabrese Firm by Interco for services which Interco requested that the Firm perform in connection with the sale of its Office Supply Division to UDI Corp. ("UDI"), for which the Trustee alleged Interco received no direct monetary consideration, but in connection with which Interco's president and principal stockholder, Clifford Davie ("Davie"), ultimately acquired 25% of the stock of UDI, was an avoidable fraudulent conveyance under Section 548(a)(2)(B)(i); (3) whether $150.00 paid to the Calabrese Firm by Interco for services which it rendered to Davie in connection with his matrimonial was an avoidable fraudulent conveyance under Section 548(a)(2); and (4) whether the payments by Interco within ninety days of the filing of the involuntary petition of five Calabrese Firm invoices for professional services rendered were avoidable preferences under Section 547(b), or whether they were unavoidable as having been paid in the ordinary course of business under the exception set forth in Section 547(c)(2).

## DISCUSSION

### I. *POST–PETITION TRANSFER.*

The payment by Interco of $6,200.00 to the Calabrese Firm in the "gap period" for services rendered by the Firm prior to the filing of the involuntary petition on January 26, 1993 is an avoidable post-petition transfer of property of the estate under Section 549(a), since the transfer: (1) was authorized only under Section 303(f); (2) does not fall within the exception set forth in Section 549(b), because the services rendered were not rendered during the "gap period", but were rendered prepetition; and (3) even though it may have otherwise been made in the ordinary course of business between Interco and the Calabrese Firm, Section 549 does not contain an exception for such a

transfer.[1]

Congress, by enacting the ordinary course of business exception to an avoidable preference in Section 547(c)(2), has demonstrated that it is aware of and capable of enacting such an exception when it feels that it is appropriate.[2] However, Congress has elected not to enact such an exception with respect to post-petition transfers, even when they are made during a "gap period".

■ Absent a specific ordinary course of business exception, this Court agrees with those cases which have determined that the exception contained in Section 549(b) is only intended to protect the post-petition payment of post-petition services provided in the "gap period", not the payment of pre-petition services. *See In re Ft. Dodge Creamery Co.*, 121 B.R. 831 (Bankr.N.D.Iowa) and the cases cited therein. This analysis is consistent with two of the fundamental policies of the Bankruptcy Code which Sections 547, 548 and 549 were in part enacted to promote; preservation of the estate and equality of distribution among the creditors of an entity for which an order for relief has been entered.

In this case, the Calabrese Firm continued to represent Interco after the filing of the involuntary petition and was ultimately appointed as the attorneys for the Debtor-in-Possession. As such, the Firm is presumed to have been aware of the provisions of Section 549 and the case law interpreting that section, so that it is a matter of concern that the Firm billed its prepetition services and allowed Interco to pay for them before it was clear whether an order for relief in connection with the involuntary petition would be entered.

## II. *AVOIDABLE FRAUDULENT CONVEYANCES.*

■ The Trustee has alleged under Section 548(a)(2)(B)(i) [3] that Interco's payment of the attorney's fees of $5,100.00 incurred in connection with the sale of its Office Supply Division to UDI was an avoidable fraudulent conveyance because Interco: (1) was stipulated to be insolvent at the time; (2) paid the attorneys fees within one year of the filing of the involuntary petition; and (3) received less than a reasonably equivalent value from the overall transaction, not because the Calabrese Firm did not perform the services

---

1. Section 549(a) and (b) provide that:
   (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
   (1) that occurs after the commencement of the case; and
   (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
   (B) that is not authorized under this title or by the court.
   (b) In an involuntary case, the trustee may not avoid under subsection (a) of this section a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before the commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.
   Section 303(f) provides that:
   Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operated, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

2. Section 547(c)(2) provides that:
   (c) The trustee may not avoid under this section a transfer—
   (2) to the extent that such transfer was—
   (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
   (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
   (C) made according to ordinary business terms.

3. Section 548(a)(2)(B)(i) provides that:
   (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
   (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
   (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as result of such transfer or obligation.

which Interco requested that it perform in connection with the transaction or because the services performed were not reasonably worth the amount billed.

■ The Trustee has not alleged that either the requests to the Calabrese Firm by Interco that it perform these services and bill it for them, or the payment made for the services, were done by Interco with the actual intent to hinder, delay or defraud its creditors, and there was no proof offered at trial of such an actual intent.[4]

Throughout the Interco case whenever the UDI transaction has been raised, whether as part of the evidentiary hearings on the Conversion Motion, this Adversary Proceeding or an adversary proceeding commenced by the Trustee against Davie, which was settled, Interco and its representatives have consistently taken the position that Interco substantially benefitted from the UDI transaction, notwithstanding that 25% of the UDI stock was ultimately obtained by Davie, because the completion of the transaction allowed Interco to: (1) collect without disputes the outstanding accounts receivable which it had generated in connection with the unprofitable Office Supply Division and which it needed to fund its attempts to save its core business; (2) avoid potential litigation from Office Supply Division subscribers for the return of subscription fees paid, or claims by them that they could offset those fees or any installments still due on them against any accounts payable due to Interco; and (3) demonstrate to its other subscribers and suppliers that it had refocused its energies on reorganizing its core business—electrical and plumbing.

At trial, the Trustee had admitted into evidence a March 24, 1992 Stock Purchase Agreement (Plaintiff's Exhibit 8 at Trial) (the "Stock Purchase Agreement"), entered into between UDI, Interco and Davie, and a July 1, 1992 Amendment to the Stock Purchase Agreement (Plaintiff's Exhibit 9 at Trial) (the

"Amendment"), entered into between UDI, Interco, Davie and the then shareholders of UDI. These Agreements provided for: (1) the transfer by Interco to UDI of its Office Supply Buying Division, including a suppliers list, a subscribers list and certain operating and trade procedures; (2) the transfer of 25% of the common stock of UDI to Davie; (3) the payment of $125,000.00 as the purchase price for the stock, which was to be paid by Davie (Paragraph 1. of the Stock Purchase Agreement); (4) a formula, based on business generated by Interco subscribers for the first year after the purchase (July 1, 1992 through June 30, 1993), which could result in a credit against the $125,000.00 purchase price; (5) the payment by Interco of the difference between the $125,000.00 purchase price and any credits which resulted from application of the formula (Paragraph 3.b.(iv) of the Stock Purchase Agreement which is inconsistent with Paragraph 1.); and (6) the payment to Interco of the required amount if the formula resulted in a credit which exceeded the $125,000.00 purchase price. The Amendment provided for the payment of any balance due on the $125,000.00 by Davie and/or Interco.

At trial, the Trustee did not call Davie or any of the officers or employees of Interco as a witness, but called Richard Calabrese, Esq. ("Calabrese") as his only witness.

Calabrese testified that: (1) he was told when asked to draft documents and work with Interco on the sale to UDI that the Office Supply Division was unprofitable; (2) he was also told that at the time, in Interco's business opinion, if it simply terminated the Office Supply Buying Group rather than selling it so that its subscribers could have the benefit of a buying group in consideration of the subscription fees that they had paid to join the Interco Office Supply Buying Group: (a) it would have substantial difficulty in collecting the approximately $450,000.00 in outstanding accounts receivable due from the Office Supply Buying Group subscribers; (b)

---

**4.** Certainly if the facts and circumstances of a particular case demonstrated that a corporation knowingly paid professional fees for a transaction intended to solely benefit a principal so as to remove assets from the corporation otherwise available to creditors, especially if an intent was

discussed with or otherwise made known to the entity providing the services, doing the billing and receiving payment, an avoidable fraudulent conveyance under Section 548(a)(1) could be proven.

it would have substantial difficulty in collecting the balances due from subscribers who were paying their subscription fees in installments, since they would likely resist paying any future installments; and (c) some subscribers might sue for the return of all or a portion of the subscription fees they had paid, which could be as much as a $400,000.00 problem; (3) Interco needed all of the outstanding Office Supply accounts receivable and subscription fee installments for its other business operations; (4) it was only as the negotiations for the transaction proceeded that UDI made it clear that it would require Davie to either be the purchaser or a guarantor of the purchase price for the UDI stock because of Interco's financial condition; (5) at the time the Stock Purchase Agreement was entered into the net worth of UDI, based upon the financial statements it provided him and Interco, was only approximately $70,000.00; (6) ultimately the UDI stock was purchased by Davie's individual private retirement fund for approximately $69,000.00, after credits under the formula in the Stock Purchase Agreement; (7) Davie's retirement fund purchased the UDI stock because neither Interco nor Davie individually had the funds to complete the purchase; and (8) at the time of the closing of the Stock Purchase Agreement, as amended, in his opinion and Interco's opinion, there was no anticipated benefit to Davie, however, Interco did benefit, as contemplated, by selling its unprofitable Division in a manner which did not require it to expend any cash but allowed it to eliminate the potential subscriber defenses to the collection of outstanding accounts receivable and subscriber fee installments.

Based upon the evidence produced at trial, the Court does not believe that the Trustee has met his burden to show that Interco received less than a reasonably equivalent value in exchange for the services that the Calabrese Firm performed at its request in connection with the sale of its Office Supply Division to UDI. From the evidence the Court: (1) can only conclude that in its business judgment, Interco believed that it received the financial benefit from the UDI transaction which it had expected and which exceeded the fees which it paid to the Calabrese Firm for the services it performed in connection with the transaction; and (2) cannot find that Interco was wrong in this business judgment and belief.[5]

Certainly, if the facts and circumstances indicate that a payment of professional fees or other expenses by a corporation was for services or goods which solely benefitted a third party, whether it be a principal, officer or employee, and had no reasonable, good faith business judgment benefit to the corporation, that payment would be avoidable under Section 548 because of a lack of reasonably equivalent value, if all of the other requirements of that Section were met. In this case, the $150.00 paid by Interco for services rendered to Davie in connection with his matrimonial is such an improper and avoidable transfer. However, when in the exercise of reasonable, good faith business judgment, there is a perceived financial benefit to the corporation which justifies the fees or expenses paid, as in the case of the sale to UDI, unless the Trustee meets his or her burden to prove that there was in fact no benefit, or a substantially and reasonably quantifiable disproportionate financial benefit, the payment of professional fees or expenses to the professionals or others who perform the services or provided the goods at the request of the corporation and charged a reasonable rate is not avoidable as a fraudulent conveyance under Section 548(a)(2)(B)(i).[6]

---

5. *See In re Trauger,* 105 B.R. 120 (Bankr.S.D.Fla. 1989) where the court felt that the trustee had not met his burden to show that there was not sufficient benefit to the debtor who paid the attorneys fees for his employees for the court to find that the debtor had received less than a reasonably equivalent value.

6. I am certain that attorneys, other professionals and suppliers have and will continue to carefully scrutinize requests by corporate clients to provide services where there may be mixed benefits and to allocate the fees charged where appropriate. I am also certain that such professionals and suppliers would not be surprised to be asked to repay fees or expenses that were clearly of no benefit to the corporate client paying for them, such as here where a corporate client paid for matrimonial services performed for its principal, as not being for reasonably equivalent value, should the client become a debtor in a bankrupt-

## III. ORDINARY COURSE OF BUSINESS PAYMENTS.

■ The Trustee has alleged that the payments by Interco of five invoices from the Calabrese Firm are avoidable preferential transfers under Section 547(b) because those prepetition payments were not in the ordinary course of business within the meaning and intent of Section 547(c) as alleged by the Calabrese Firm.[7] The parties have agreed that the Trustee has met his burden to prove that the payments were preferential under Section 547(b), and that they are avoidable unless by a preponderance of the evidence the Calabrese Firm can prove that they were made in the ordinary course of business under Section 547(c). The parties have further agreed that these prepetition payments were in payment of debts incurred in the ordinary course of business of Interco and the Calabrese Firm within the meaning of Section 547(c)(2)(A), leaving the Court only to decide whether they were made in the ordinary course of business and according to ordinary business terms as required by subsections (B) and (C) of Section 547(c)(2).

The Trustee has asserted in this adversary proceeding that for purposes of determining whether the Calabrese Firm has met its burden to show that these payments by check were made in the ordinary course of business, the Court should use the date that each check was paid by Interco's bank as the transfer date, as required by the decision of the United States Supreme Court in *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). Although clearly that is the rule when determining the ninety-day and one year periods under Section 547(b), the Supreme Court in *Barnhill* recognized that for purposes of determining the exceptions under Section 547(c), courts had generally concluded that the date of the delivery of a check should be the controlling date. *See Barnhill v. Johnson*, 503 U.S. 393, 402, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39.

At trial, Calabrese testified that the Calabrese Firm did not keep a record of the date a check in payment of one of its invoices was received, but only kept a record of the date that a payment was posted to the client's account, which in many cases could be several days after a check was received. In reviewing a history of the billings from the Calabrese Firm to Interco and Interco's payments of the respective invoices (the posting date) from October, 1989 to the date of the voluntary petition, (Defendant's Exhibit 1 at Trial), it is clear that there was a regular pattern of at least monthly billings and regular payments by Interco, generally within sixty days.[8]

Assuming a two-day period for mail delivery between Interco and the Calabrese Firm, Preference Payments 2, 3 and 4 were paid by Interco from between thirty-one and forty-two days after the date of the Calabrese Firm invoice.[9] Given the long history of

cy case and all the other requirements of Section 548 be proved.

7. The payments in question were as follows:

| Calabrese Firm Invoice Date | Date of Interco Check | Date Check Honored | Preference Payment | Amount |
|---|---|---|---|---|
| Sept. 15, 1992 & Oct. 5, 1992 | Nov. 23, 1992 | Nov. 30, 1992 | 1 | $ 2,018.44 |
| Nov. 4, 1992 | Dec. 3, 1992 | Jan. 4, 1993 | 2 | $ 5,000.00 |
| Nov. 4, 1992 | Dec. 7, 1992 | Jan. 4, 1993 | 3 | $11,842.00 |
| Dec. 3, 1992 | Jan. 13, 1993 | Jan. 22, 1993 | 4 | $ 9,631.00 |
| | | **Total** | | **$28,491.44** |

8. In most adversary proceedings filed with this Court alleging that payments to professionals are avoidable preferential transfers, the Court sees a pattern of irregular billing and payment, making it extremely difficult to determine what the ordinary course of business is between the professional and the client.

9. The period between the invoice and Preference Payments 2 and 3 included the Thanksgiving holiday and in the case of Preference Payment 4, the Christmas and New Years holidays.

billings and payments between Interco and the Calabrese Firm, this period of thirty-one days to forty-two days between the invoice date and payment, which included major holidays, is clearly within the ordinary course of business between the parties, and clearly would be in the ordinary course of business of any company such as Interco and any law firm such as the Calabrese Firm in a similar attorney-client relationship. For treatment and discussion of the ordinary course of business application, *see In re Roblin Industries, Inc.,* 78 F.3d 30 (2nd Cir.1996); *Matter of Tolona Pizza Products Corp.,* 3 F.3d 1029, 1032–1033 (7th Cir.1993).

Regarding Preference Payment 1, it appears that in September, prior to the Calabrese Firm September 15, 1992 invoice, there was a duplicate payment by Interco of an August 28, 1992 invoice. This duplicate payment was in an amount greater than Preference Payment 1. It is reasonable to conclude that this may have caused confusion in the accounts payable department of Interco, making the payment of the September 15, 1992 and October 5, 1992 invoices in late November an unusual and exceptional transaction between the parties. As a result, based upon the evidence, including the billing and payment history and the overpayment of the August 28, 1992 invoice, I cannot find that preference payment 1 is outside the ordinary course of business.

Overall, it appears that: (1) the Calabrese Firm was providing regular and extensive legal services to Interco; (2) the Calabrese Firm was billing Interco for those legal services on a regular basis, at least once a month; (3) Interco was paying for the services provided by the Calabrese Firm on a regular basis, within a reasonable period of time after receipt of an invoice and consistent with the history of the relationship between the parties; and (4) Interco's payment pattern was consistent with what would be the ordinary course of business for an entity such as Interco. Therefore, the Court finds that the Calabrese Firm has met its burden to prove that the four payments in question were within the ordinary course of business as contemplated by Section 547(c).

## CONCLUSION

The payment by Interco of $6,200.00 to the Calabrese Firm in the "gap period" for services rendered by the Firm prior to the filing of the involuntary petition on January 26, 1993 is an avoidable post-petition transfer, and such amount shall be paid over to the Trustee within ten (10) business days of the date of this Decision & Order.

The payment by Interco of $5,100.00 to the Calabrese Firm alleged by the Trustee to be an avoidable fraudulent transfer, is found to be unavoidable, and the $28,491.44 in pre-petition payments made by Interco to the Calabrese Firm, alleged by the Trustee to be avoidable preferential transfers, are found to be unavoidable.

**IT IS SO ORDERED.**