In re GREATER SOUTHEAST
COMMUNITY HOSPITAL
CORP., I, et al., Debtors.

Sam J. Alberts, Trustee for the DCHC
Liquidating Trust, Plaintiff,

v.

Paul Tuft, et al., Defendants.

Bankruptcy No. 02–02250.
Adversary No. 04–10459.

United States Bankruptcy Court,
District of Columbia.

Oct. 31, 2005.

Ted A. Berkowitz, Farrell Fritz, PC, Uniondale, NY, Joseph R. Damato, Seyfarth Shaw, David Fisher, Assistant Attorney General, Peter D. Isakoff, Cleveland Lawrence, III, Weil, Gotshal & Manges LLP, Holly E. Loiseau, Jeffrey W. Kilduff, O'Melveny & Myers LLP, Washington, DC, Deryck A. Palmer, New York, NY, Christopher R. Mirick, Andrew M. Troop, Weil, Gotshal & Manges LLP, Boston, MA, for Debtors.

---

**1.** The defendants are Paul Tuft, Melvin Redman, Steve Dietlin, Erich Mounce, Donna Talbot, Susan Engelhard, Rebecca Parrett, George Krauss, "John Doe" (representing one or more anonymous directors and/or officers of DCHC), Epstein Becker & Green P.C. and Kutak Rock LLP (collectively the "Defendants").

*OPINION REGARDING DE-
FENDANTS' MOTIONS
TO DISMISS*

S. MARTIN TEEL, JR., Bankruptcy Judge.

This Opinion resolves a series of motions filed by various defendants [1] in this adversary proceeding initiated by Sam J. Alberts as Trustee of the DCHC Liquidating Trust (the "Trust") established by the plan (the "Plan") confirmed under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, in the jointly administered cases of Doctors Community Healthcare Corporation ("DCHC") and its subsidiary and affiliated debtor corporations (collectively the "Debtors").[2] The Trust alleges that DCHC's former directors and officers (the "D & O Defendants"), with assistance from two law firms (collectively the "Law Firm Defendants"), Epstein Becker & Green P.C. ("Epstein Becker") and Kutak Rock LLP ("Kutak Rock"), negligently and in some instances intentionally drove the Debtors further into debt in furtherance of a Ponzi scheme perpetrated by the Debtors' primary if not sole lender, National Century Financial Enterprises ("NCFE"), and its subsidiary and affiliated lenders (collectively the "NCFE Entities"). It seeks recovery not only for assets actually drained out of the Debtors' estates prior to their bankruptcy filings, but also for the debt accumulated by the Debtors in the years leading up to DCHC's bankruptcy filing—an amount totaling $242 million.

To that end, the Trust has filed a twenty-one count Complaint against the Defendants alleging breach of fiduciary duty

---

**2.** The other Debtors are colloquially known as Greater Southeast Hospital ("Greater Southeast"), Hadley Memorial Hospital, Michael Reese Medical Center, and Pacifica of the Valley Hospital.

(Counts I–V)[3] and corporate waste (Counts V–IX) with respect to the D & O Defendants; aiding and abetting fiduciary duty (Count XIII) and malpractice (Count XIV) with respect to the Law Firm Defendants; and "deepening insolvency" (Counts X–XI) with respect to all of the Defendants. It also claims (presumably in the alternative) that the Law Firm Defendants "aided and abetted deepening insolvency" (Count XI), and seeks the recovery of fraudulent conveyances from the Law Firm Defendants pursuant to 11 U.S.C. §§ 544, 548, and 550 and Arizona Rev. St. § 44–1004 and 44–1005 (Counts XVI–XXI). Finally, the Trust claims that it may recover damages for Counts I–XIV in the alternative as a "hypothetical judgment creditor" under the "strong-arm" provision of 11 U.S.C. § 544(a) (Count XV).

## I

The Debtors filed petitions under chapter 11 of the Bankruptcy Code on November 20, 2002. After protracted proceedings lasting almost 18 months, the Debtors achieved confirmation of the Plan on April 5, 2004, and their operations were taken over by entities known as the "Reorganized Debtors." Section 6.6 of the Plan provides for the creation of the Trust, which is charged with liquidating certain assets of the Debtors and distributing the proceeds to certain classes of creditors (including certain unsecured creditors).[4] Among the assets transferred to the Trust were any claims that the Debtors could have raised before, on, or after the petition date with respect to third parties, (see Plan §§ 1.50, 1.53, 6.6(c)), as well as any claims against the former directors and officers of the Debtors arising out of their management and governance of the Debtors in an amount not exceeding $10 million. (See Plan §§ 1.50, 1.103, 12.1).

The Plan also provides for the creation of a "Liquidating Trust Reserve" in the amount of $1 million to be used toward the prosecution of unliquidated claims transferred to the Trust. (Plan § 1.51). The Plan further provides that the Debtors' chapter 11 cases will remain open until the Trust resolves all claims in its possession, (Plan § 6.7), and that this court retains jurisdiction over any adversary proceeding initiated by the Trust. (Plan Art. XI(b)).

Pursuant to its mandate under the Plan, the Trust initiated the instant adversary proceeding on November 19, 2004. (D.E. No. 1). Presumably in response to motions to dismiss filed by Epstein Becker and Kutak Rock,[5] the Trust filed an

---

**3.** The court employs Roman numerals to describe the counts in lieu of the numbering actually used in the Complaint of "Count One" and so forth.

**4.** Section 6.6(a) of the Plan specifies that the Trust "shall be for the benefit of the holders of the NCFE Claim, Allowed General Unsecured Claims and Allowed Patient Refund Claims." Other creditors' claims were discharged by the Plan (e.g., if no timely claim was filed) or assumed by the Reorganized Debtors (as in the case of allowed medical malpractice claims). (See generally Plan Art. IV).

**5.** Kutak Rock chose to file both a second motion to dismiss the Complaint as amended and a reply memorandum in support of its original motion even though the original motion was moot in light of the Trust's amendments to the Complaint. See Nat'l City Mortgage Co. v. Navarro, 220 F.R.D. 102, 106 (D.D.C.2004) (denying without prejudice motions to dismiss complaint that was amended subsequently on grounds of mootness). Rather than consider Kutak Rock's reply a nullity, the court will treat its reply as an addendum to its memorandum of law in support of its motion to dismiss the amended Complaint in the interests of judicial efficiency and fairness to the parties. The court has already denied Kutak Rock's Motion to Strike Portions of Plaintiff's Consolidated Opposition to the Motions to Dismiss (D.E. No. 115) for the same reason. (D.E. No. 131).

amended complaint on April 15, 2005 (D.E. No. 45) (the "Complaint"). The Complaint alleges that DCHC purchased a number of subsidiary hospitals (including the other Debtors) from 1992 through 1999, and that DCHC obtained financing from NCFE or one of the NCFE Entities to either purchase each hospital or fund its accounts receivable. (Compl.¶¶ 5–6). The funding obtained from NCFE and the NCFE Entities was not procured in the best interests of the Debtors, but rather was obtained at NCFE's direction in furtherance of a Ponzi scheme directed by NCFE. (Compl.¶¶ 115–125).

According to the Complaint, the NCFE Entities loaned far more money to the Debtors than the Debtors could reasonably repay. (Compl.¶¶ 61, 65, 78–79, 96, 110). Instead, successive NCFE Entities would "pay off" the debt of a particular Debtor and assume a new lender-borrower relationship with that Debtor. (Compl.¶¶ 46–48, 58–65, 67, 76–79, 89–90). The Complaint alleges that this strategy decreased the value of the Debtors' assets from December 31, 1999, to December 31, 2002, from a net deficit of $205 million to a net deficit of $460 million. (Compl.¶¶ 119–122). The Debtors' deepening insolvency was a direct result of the D & O Defendants' abdication of their duties in favor of NCFE as well as the wasteful practices of the Debtors. (Compl.¶¶ 123–125, 148–172). The Complaint further alleges that the Law Firm Defendants helped cause the Debtors' deepening insolvency by failing to warn the Debtors of the consequences of their funding arrangements

with the NCFE Entities and by issuing opinion letters and sponsoring testimony that allowed the NCFE Entities to overfund the Debtors. (Compl.¶¶ 126–147).

Kutak Rock, Epstein Becker, the D & O Defendants, and former DCHC directors Rebecca Parrett and George Krauss have all filed separate motions to dismiss the Trust's Complaint.[6] Although certain issues and arguments overlap in their motions, each movant (with the possible exception of George Krauss)[7] raises at least one unique argument. Consequently, the court is left with a morass of arguments to sift through in deciding whether the Trust's suit should proceed to discovery.

## II

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure as incorporated by Federal Bankruptcy Rule 7012. The rule permits dismissal of a complaint due to "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "A Rule 12(b)(6) motion is intended to test the legal sufficiency of the complaint." *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C.Cir. 2003). To survive such a motion, "a complaint need only set forth 'a short and plain statement of the claim,' FED. R. CIV. P. 8(a)(2), giving the defendant fair notice of the claim and the grounds upon which it rests." *Id.* at 1040. "However, the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by

---

**6.** Epstein Becker also filed a Motion to Strike Scandalous Material or, in the Alternative, to Compel Disclosures Indicating Good Faith (D.E. No. 72). The court does not find the allegations in the Complaint to warrant such extreme treatment. The motion will be denied without prejudice.

**7.** Initially, Mr. Krauss argued that the Complaint should be dismissed with respect to him under Fed.R.Civ.P. 4(m). (Krauss Memo. at 4–6). He withdrew that argument in his consolidated reply memorandum with Rebecca Parrett. (Parrett/Krauss Reply at 1 n. 1). His remaining arguments are identical to those raised by Ms. Parrett in her motion to dismiss.

the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994).

■ In addition to making numerous arguments regarding the sufficiency of the Trust's pleading, the Defendants also assert a variety of affirmative defenses as grounds for dismissal under Rule 12(b)(6). Although not resolved ordinarily on a motion to dismiss, such defenses "may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint." *Smith–Haynie v. District of Columbia,* 155 F.3d 575, 578 (D.C.Cir. 1998).

The arguments raised by the various defendants fall into four basic categories: (1) arguments regarding the sufficiency of the Trust's claims against all of the Defendants; (2) arguments regarding the sufficiency of claims raised by the Trust against the D & O Defendants; (3) arguments regarding the sufficiency of claims raised by the Trust against the Law Firm Defendants; and (4) arguments relating to affirmative defenses asserted by all of the parties. The court considers each of these categories in turn.

### A. *Claims Against All Defendants*

#### 1. *"Deepening Insolvency" claims*

■ Counts X–XII of the Complaint plunge this court into the on-going debate over the existence and nature of the so-called "deepening insolvency" cause of action. Briefly stated, the theory "refers to the 'fraudulent prolongation of a corporation's life beyond insolvency,' resulting in damage to the corporation caused by the increased debt." *Kittay v. Atlantic Bank of New York (In re Global Serv. Group, LLC),* 316 B.R. 451, 456 (Bankr.S.D.N.Y.

2004) (quoting *Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir.1983)). Originally a theory of damages, *see id.* at 456–57, the concept has taken on a life of its own, with several courts treating it as an independent cause of action. *See, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 349–52 (3d Cir.2001) ("*Lafferty* "); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Technologies, Inc.),* 299 B.R. 732, 750–52 (Bankr.D.Del.2003). Under either permutation, the *sine qua non* of the concept is that the defendant breached some pre-existing duty of care owed to the corporation in deepening its insolvency. *See In re Global Serv. Group, LLC,* 316 B.R. at 458 ("[O]ne seeking to recover for 'deepening insolvency' must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt.") (collecting cases).

This court has recognized that the deepening of a company's insolvency is harmful. *See Drabkin v. L & L Constr. Associates, Inc. (In re Latin Inv. Corp.),* 168 B.R. 1, 5 (Bankr.D.D.C.1993) (considering "damages inflicted in perpetuating the debtor's existence past the point of insolvency in order to loot"). As the Third Circuit explained in *Lafferty:*

> [T]he incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation.... When brought on by unwieldy debt, bankruptcy also creates operational limitations which hurt a corporation's ability to run its business in a profitable manner.... In addition, prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets.

*Lafferty,* 267 F.3d at 349–50 (citations omitted).

■ However, recognizing that a condition is harmful and calling it a tort are two different things. The District of Columbia courts have not yet recognized a cause of action for deepening insolvency, and this court sees no reason why they should. As District Judge Kaplan recently noted in a similar situation, "[i]f officers and directors can be shown to have breached their fiduciary duties by deepening a corporation's insolvency, and the resulting injury to the corporation is cognizable, . . . that injury is compensable on a claim for breach of fiduciary duty." *Bondi v. Bank of America Corp. (In re Parmalat),* 383 F.Supp.2d 587 (S.D.N.Y.2005) (dismissing deepening insolvency claim as duplicative where breach of fiduciary duty was also alleged).

The Trust's allegations bear out Judge Kaplan's thesis. The Trust already alleges that the D & O Defendants breached their fiduciary duties to the Debtors by allowing them to fall deeper into debt for the benefit of the Defendants and NCFE. Its claim for "deepening insolvency" against those same defendants alleges the exact same wrong. (*Compare* Compl. ¶¶ 176–184, 205–207 *with* ¶¶ 261–269). Similarly, the Trust's deepening insolvency claim against the Law Firm Defendants is really just a re-packaging of its separate malpractice claim. (*Compare* Compl. ¶¶ 282 *with* ¶¶ 312–312). And the Trust's claim for "aiding and abetting deepening insolvency" is almost a word-for-word recapitulation of its claim for aiding and abetting breach of fiduciary duty. (*Compare* Compl. ¶¶ 296–297 *with* ¶ 306).

There is *no point* in recognizing and adjudicating "new" causes of action when established ones cover the same ground. The Trust's duplicative claims will be dismissed.

**2. *Claims under 11 U.S.C. § 544(a)***

Count XV of the Complaint is also largely duplicative of other counts (specifically, Counts I–XIV), but this is by the Trust's design. The "claim" alleges that the Trust stands in the shoes of a hypothetical judgment creditor with a judicial lien or creditors' bill under § 544(a) of the Bankruptcy Code, which, according to the Trust, permits it to (1) pursue claims that such creditors would hold for breach of fiduciary duty, and (2) garnish or "seize" the Trust's own claims and prosecute those claims as a creditor rather than as a representative of the estate. (Compl.¶¶ 318–320). The Defendants argue that § 544(a) cannot be used in this manner under *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). The Trust points to a series of cases applying § 544(a) notwithstanding that decision.

(a)

■ In addressing the argument that a hypothetical creditor could sue for breach of fiduciary duty, the starting point for the court's analysis is the language of § 544(a) itself, which states in pertinent part:

> The Trust shall have, as of the commencement of the case, and without regard to any knowledge of the Trust or of any creditor, the *rights and powers* of . . . (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; [or] (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is re-

turned unsatisfied at such time, whether or not the creditor exists ....

11 U.S.C. § 544(a)(1)-(2) (emphasis added).

The key question is whether the phrase "rights and powers" encompasses the ability to file any claim that a creditor with a judicial lien or creditors' bill against the property of the estate might possess as opposed to only those rights that are attained by virtue of the hypothetical status of a judicial lien creditor or an execution creditor. A handful of courts have held that it does. *See Sender v. Porter (In re Porter McLeod, Inc.),* 231 B.R. 786, 792–93 (D.Colo.1999); *Raleigh v. Schottenstein (In re Wieboldt Stores, Inc.),* 131 B.R. 655, 668 (N.D.Ill.1991) *Collins v. Kohlberg & Co. (In re Southwest Supermarkets, LLC),* 325 B.R. 417, 426–27 (Bankr.D.Ariz.2005); *Henderson v. Buchanan (In re Western World Funding, Inc.),* 52 B.R. 743, 773–75 (Bankr.D.Nev.1985). Other courts, including most circuit courts to have considered the issue, have reached the opposite conclusion. *See, e.g., Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991); *E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d 979, 985–86 (11th Cir.1990); *Mixon v. Anderson (In re Ozark Rest. Equip. Co., Inc.),* 816 F.2d 1222, 1226–30 (8th Cir.1987); *Sigmon v. Miller–Sharpe, Inc. (In re Miller),* 197 B.R. 810, 812–15 (W.D.N.C.1996); *Rodolakis v. Shadduck (In re Shadduck),* 208 B.R. 1, 2–5 (Bankr. D.Mass.1997). The basis for these latter decisions is usually continued deference to *Caplin.*

In *Caplin,* the Supreme Court held that a chapter X trustee under the old Bankruptcy Act could not assert creditors' claims of misconduct against an indenture trust on behalf of the holders of debentures issued pursuant to an indenture.[8]

406 U.S. at 434, 92 S.Ct. 1678. The Court held that the Bankruptcy Act did not confer upon the trustee standing to represent the interests of these creditors for three reasons. First, nothing in the Act suggested that the trustee should "assume the responsibility of suing third parties on behalf of debenture holders [*i.e.,* creditors]." *Id.* at 428, 92 S.Ct. 1678. Second, the bankrupt corporation had no claim against the indenture trustee, and the claims brought by the chapter X trustee might be subject to subrogation by other creditors because the bankrupt corporation might be subject to the doctrine of *in pari delicto. See id.* at 430–31, 92 S.Ct. 1678. Finally, a suit by the trustee would not preempt suits by other creditors, and would raise concerns as to the binding effect of the actions taken by the trustee on those creditors. *See id.* at 432, 92 S.Ct. 1678.

Although *Caplin* was decided before the enactment of the Bankruptcy Code, numerous courts, including this one, have recognized its continuing vitality. *See In re Latin Investment Corp.,* 168 B.R. at 4. Generally speaking, these courts have continued to honor the decision because (1) nothing in the text or legislative history of the Code contradicts directly the *Caplin* opinion; and (2) many of the concerns that informed the Supreme Court's opinion still exist. *See E.F. Hutton & Co., Inc.,* 901 F.2d at 985–86; *In re Ozark Rest. Equip. Co.,* 816 F.2d at 1228–30; *In re Miller,* 197 B.R. at 812–15; *In re Shadduck,* 208 B.R. at 2–5.

With respect to § 544 in particular, courts have noted that the section as originally proposed by the House of Representatives included a subsection "(c)" that would have overruled *Caplin. See In re*

---

8. The debenture holders were creditors of the bankruptcy estate. *Caplin,* 406 U.S. at 420 n. 11, 92 S.Ct. 1678.

*Ozark Rest. Equip. Co.,* 816 F.2d at 1228 n. 9; *In re Miller,* 197 B.R. at 812–13. That section was eventually deleted by Congress. The implication (at least for courts that apply the rule in *Caplin*) is that Congress would not have dropped the subsection unless it did not want to overrule *Caplin. In re Ozark Rest. Equip. Co.,* 816 F.2d at 1228–29; *In re Miller,* 197 B.R. at 812–13.

Courts interpreting *Caplin* more narrowly have reasoned that the Court's concerns about the effect of trustee lawsuits on the complex congressional system regulating indenture trusts do not exist with respect to state law tort claims, *see St. Paul Fire & Marine Ins. Co. v. PepsiCo Inc.,* 884 F.2d 688, 700–01 (2d Cir.1989), and that the decision applies only to claims brought on behalf of individual creditors, not general claims on behalf of all creditors. *See Koch Refining v. Farmers Union Cent. Exch., Inc.,* 831 F.2d 1339, 1348–49 & n. 11 (7th Cir.1987). In addition, at least one commentator has argued that *Caplin's* ruling was based only on language from the Bankruptcy Act predecessor to § 541 of the Code and does not limit a Trust's standing under § 544 in any way. *See* Steven E. Boyce, *Koch Refining and In re Ozark: the Chapter 7 Trust's Standing to Assert an Alter Ego Cause of Action,* 64 Am. Bankr. L.J. 315, 324–25 (Summer 1990).

The court finds these attempts to limit *Caplin* unpersuasive. First, while it is true that actions premised on state law tort claims (including this one) do not involve indenture trusts, the Supreme Court was equally concerned that Congress had created "an elaborate system of controls with respect to ... reorganization proceedings," *Caplin,* 406 U.S. at 428, 92 S.Ct. 1678, yet did not indicate anywhere in the "statutory scheme" that the trustee was responsible for prosecuting creditors' claims. *See id.* The statutory scheme may have changed since *Caplin* was decided, but the point remains valid. Nothing in the Bankruptcy Code so much as hints that the trustee has a duty to prosecute the claims of creditors in addition to those of the estate.

Second, the distinction made by the *Koch* court and its progeny between "personal" and "general" creditors' claims is without real difference. In either case, the trustee would be placed in the position of pursuing a claim that does not belong to the estate and that does not arise as a result of an injury to the debtor corporation. The trustee has no standing to pursue claims arising from injuries to others. *See In re Latin Invest. Corp.,* 168 B.R. at 6–7 (trustee had standing to pursue claims based on injury to bankrupt corporation, but not claims based only on injuries to third-party creditors); *accord E.F. Hutton & Co., Inc.,* 901 F.2d at 985. Indeed, the Seventh Circuit effectively overruled *Koch* in *Steinberg v. Buczynski,* 40 F.3d 890 (7th Cir.1994), for this exact reason. *See id.* at 892–93 (dismissing the "general"/"personal" distinction made in *Koch* as "not an illuminating usage").

Finally, the court finds no language in *Caplin* suggesting that the Supreme Court meant to restrict its ruling to what is now § 541 of the Bankruptcy Code. To the contrary, the court framed the issue before it as whether the trustee "ha[d] standing under *[c]hapter X* of the Bankruptcy Act" to assert claims on behalf of debenture holders. *Caplin,* 406 U.S. at 416, 92 S.Ct. 1678 (emphasis added). It found nothing in the entire "statutory scheme" of chapter X to support such a notion. *Id.* at 428, 92 S.Ct. 1678. Moreover, the Court explicitly rejected the notion that there was "anything in 11 U.S.C. § 110 [Bankruptcy Act § 70]" giving the trustee authority to prosecute creditors' claims, and alluded to only

the part of 11 U.S.C. § 110 dealing with property of the estate as relevant. *Id.; see also id.* at 424 n. 14, 92 S.Ct. 1678.[9] However much one might disagree with the Supreme Court's conclusions regarding the language in that section of the old Bankruptcy Act (and this court does not), that does not entitle this court to ignore or second-guess the conclusions drawn by the Supreme Court on that issue.

Most importantly, there is nothing in the language of § 544(a) that compels this court to disregard the well-reasoned holding in *Caplin.* As the district court noted in *In re Miller,* the "clear import of the statutory language" is to "confer the *status*" of a creditor with a judicial lien or creditors' bill on the trustee, not to make the trustee "an agent of the creditors." 197 B.R. at 814–15 (emphasis in original). In other words, the statute vests the trustee with the ability of a judgment lien creditor to attach or seize both tangible and intangible property transferred by the debtor to a third party prior to filing for bankruptcy, but it does not transform the trustee into a "super creditor" with the ability to raise causes of action separate

from those possessed by the estate. *See, e.g., In re Schneiderman,* 251 B.R. 757, 760–61 & n. 2 (Bankr.D.D.C.2000) (§ 544(a) conferred upon trustee the right to serve writ of attachment).

As a practical matter, the latter construction would be impossible to enforce. After all, how much would the hypothetical "super creditor's" claim be worth? [10] Which state's laws would govern the "super creditor's" rights? What types of claims could the "super creditor" bring? In light of the third problem identified in *Caplin*—that an action by the bankruptcy trustee on behalf of creditors "may be inconsistent with any independent actions that they might bring themselves," 406 U.S. at 431–32, 92 S.Ct. 1678—what happens to independent actions that creditors may pursue in their own right against the same defendants for the same wrongs? [11] Finally, if the hypothetical judgment lien creditor extended credit only on the date of commencement of the bankruptcy case, how can she sue based on a wrong that occurred before the extended credit?

Section 544(a) is silent on these points, most likely because Congress never in-

---

9. Section 110 (Bankruptcy Act § 70) contained language comparable (as relevant here) to that now found in *both* §§ 541 *and* 544 of the current Code. *See* Bankruptcy Act, 52 Stat. 833, at § 70(a), 11 U.S.C. § 110(a) (forerunner of current § 541 of the Bankruptcy Code); *see also id.* at § 70(c), 11 U.S.C. § 110(c) (forerunner of Bankruptcy Code § 544). The Court did not even view § 70(c) as presenting a basis for an argument by the bankruptcy trustee that he could pursue creditors' claims against a third party that is not obligated to the estate.

10. Section 544(a)(1) and (2) are silent regarding the size of the hypothetical judgment lien creditor's (or execution creditor's) claim. The focus is on the rights she has by virtue of being a judgment lien or execution creditor, not the dollar amount of her claim, and not those rights that a creditor in general might have without having attained the status of a

judgment lien creditor (or execution creditor). Thus, the court's limited research has revealed no case in which a trustee attempted to argue that a hypothetical judgment lien or execution creditor under § 544(a)(1) or (2) could sue to set aside a transfer that was fraudulent as to future creditors. If the Trust's argument was right, a trustee of an estate that is solvent to the tune of $5 million could pursue such a state law fraudulent conveyance claim by hypothesizing that a § 544(a)(1) hypothetical judgment lien creditor's claim was $6 million, thus rendering the estate hypothetically insolvent.

11. Section 544(a) does not vest the hypothetical judgment lien creditor with the claims of actual creditors, and thus does not displace those creditors' rights to sue third parties on claims that those actual creditors, but not the debtor, could pursue.

tended for the statute to be used in such an expansive manner. For all these reasons, and for the reasons set forth in *Caplin* and *Steinberg*, this court concludes that § 544(a) does not confer upon a trustee the right to assert claims other than those belonging to the estate.[12]

(b)

■ Applying *Caplin* does not entirely resolve the disposition of Count XV. The Trust contends that if a claim that the estate inherited from the debtor under § 541 is barred by defenses that could have been applied against the debtor, a bankruptcy trustee may nevertheless step into the shoes of a hypothetical creditor under § 544(a), execute on those claims, and prosecute those claims free of those defenses that barred only the debtor's pursuit of the claims. The Trust's argument, while clever, falls apart once one understands that § 544(a) merely enhances the trustee's rights under § 541 by giving him the power of a hypothetical creditor to attach a judicial lien or bring a creditors' bill for property transferred out of the estate.

As the *In re Miller* court noted, interpreting § 544(a) properly narrows the issue to "whether the [T]rust[ ] can pursue the claims against [the Defendants] by virtue of the status conferred by § 544 under the applicable state law." 197 B.R. at 815. The entire Code provision is "flavored with the notion of the trustee having the power to avoid 'transfers' of the debtor, as were its predecessors, sections 70c and e of the [Bankruptcy] Act." *In re Ozark Rest. Equip. Co., Inc.,* 816 F.2d at 1229. Section 544(a) does not split the trustee like an amoeba into a simultaneously existent creditor-entity and debtor-entity, with the creditor-entity attaching a lien against or

bring a creditor's bill regarding a cause of action already in the possession of the debtor-entity. It contemplates just one entity, and that is the representative of the estate. There is no need to employ § 544(a) to bring into the estate that which is already in the estate under § 541, and Congress did not envision that a trustee could actually attach, seize, or garnish a claim that is already in her possession anymore than a creditor with an actual judicial lien or creditors' bill could attach, seize, or garnish a claim that already has been given to her.

■ Even if the Trust could somehow take this sort of action with respect to its own property, it would not be able to do so with respect to its claims against the Defendants because neither judicial liens nor creditors' bills allow creditors to attach or seize claims that have not been liquidated. *See Consumers United Ins. Co. v. Smith,* 644 A.2d 1328, 1356 (D.C.1994) ("[A] writ of garnishment covers only the property of the debtor in the hands of the garnishee at the time the writ is served ...."); *Davidson–Chudacoff/Kol–Pak of Arizona, Inc. v. Pioneer Hotel Co.,* 129 Ariz. 254, 630 P.2d 550, 553–54 (App.1981) (debt must be "existing, ascertainable[,] and not contingent on other events" to be subject to garnishment); *McNeilly v. Furman,* 95 A.2d 267, 272 (Del.1953) ("[A] tort claim neither liquidated nor readily susceptible of liquidation[ ] is not subject to attachment, execution, garnishment, sequestration[,] or other judicial process under our laws ...."). And even if the Trust could attach, seize, or garnish its own unliquidated claims against the Defendants, that action would not benefit it in the slightest because "an attaching or gar-

---

12. This includes any claim transferred by the debtor whose transfer is avoided by the trustee under § 544 or any of the trustee's other avoidance powers. *See* 11 U.S.C. § 541(a)(3), (4), and (7).

nishing creditor can gain no greater right over the property or interest of the judgment ... than the debtor himself has therein." *Ellery v. Cumming,* 40 Ariz. 512, 14 P.2d 709, 710 (1932); *accord Carina Mercury, Inc. v. Igaravides,* 344 F.2d 397, 400–01 (1st Cir.1965); *US v. Winnett,* 165 F.2d 149, 151 (9th Cir.1947); *see also Lakeshore Motor Freight Co. v. Glenway Indus., Inc.,* 2 Ohio App.3d 8, 440 N.E.2d 567, 569–70 (1981) (creditors' bill does not allow creditor to direct prosecution of claim); *Bonte v. Cooper,* 90 Ill. 440, *available at* 1878 WL 10181, *3 (Ill.1878) (creditors' bill or judicial lien "will not lie to reach assets which the creditor could not maintain an action in its own name to recover"); *accord Noonan v. Stein,* 56 Colo. 64, 136 P. 1181, 1185 (1913).

In sum, the Trust cannot use § 544(a) to bring claims separate from those of the estate or to constructively "seize" the estate's claim in the guise of a creditor, and even if it could, such action would not benefit it in the slightest. Count XV will be dismissed.

### B. *Claims Against the D & O Defendants*

Aside from its deepening insolvency claims, the Trust's allegations against the D & O Defendants consist of garden-variety fiduciary duty causes of action. Not surprisingly, the D & O Defendants urge dismissal of these claims. Specifically, they argue that Counts I, IV–VII, and IX should be dismissed with respect to every D & O Defendant because they are in general not properly pled (D & O Memo. at 17–20), that Counts I–II, IV–VI, and VIII should be dismissed with respect to DCHC's former officers because the Complaint is not properly pled with respect to those defendants in their capacities as officers (D & O Memo. at 13–14), and that all counts must be dismissed with respect to Paul Tuft in his capacity as a director of DCHC because of an exculpation provision in DCHC's certificate of incorporation (D & O Memo. at 20–21). Defendants Rebecca Parrett and George Krauss also assert these and other arguments in separate motions to dismiss. (Parrett Memo. at 4–15; Krauss Memo. at 6–7).[13]

#### 1. *Arguments raised by all D & O Defendants*

#### (a) *Claims related to the NCFE Entities*

■ The D & O Defendants argue that, with respect to the claims for breach of fiduciary duty relating to the NCFE Entities' lending practices (Counts I and IV–V), the Complaint is defective because it alleges funding arrangements between the NCFE Entities and DCHC's subsidiary hospital corporations, not DCHC itself. They contend that whatever duties the directors and officers of DCHC owed to that company, they were not responsible for harms incurred by DCHC's subsidiary hospital corporations.

■ The Trust argues that the D & O Defendants should be held liable for the actions of the subsidiary hospital corporations because these subsidiary companies were "dominat[ed]" by DCHC and, by implication, its fiduciaries. Alternatively, it argues that the Complaint alleges sufficient facts to support a piercing of the corporate veil. (D & O Opp. at 35–38); *see also Phoenix Canada Oil Ltd. v. Texaco, Inc.,* 658 F.Supp. 1061, 1084 (D.Del.1987) (parent corporation may be liable for sub-

---

**13.** This summation omits the D & O Defendants' arguments with respect to Counts X–XI and XV, which this court has already determined must be dismissed, (*see* section II.A, *supra* ), and their arguments for dismissal of all counts on timeliness and *in pari delicto* grounds, which the court addresses below. (*See* section II.C.3.b–II.D, *infra* ).

sidiary's actions if parent dominates the activities of the subsidiary or veil between parent and subsidiary can be pierced).[14]

But there are virtually no facts alleged in the Complaint that support the Trust's position. The Complaint merely states that DCHC "*currently* manages and owns" the subsidiary hospitals. (Compl.¶ 31) (emphasis added). There is no indication that DCHC forced its subsidiaries to enter into lending agreements with the NCFE Entities, or that there was an identity of interests between the various companies at the time of the challenged loans.[15]

 Tellingly, the Trust relies more on the Debtors' Disclosure Statement than its own Complaint to support its

"domination" and veil-piercing theories. (D & O Opp. 34–38). The court cannot consider this document in the context of a motion to dismiss. Instead, the court must limit its inquiry to the four corners of the Complaint itself, as well as any documents incorporated by reference in the Complaint or facts subject to judicial notice. *See Nat'l Treasury Employees Union v. Chertoff*, 385 F.Supp.2d 1, 16 (D.D.C.2005).[16] The Trust cannot substitute the Debtors' Disclosure Statement for its own pleading, and the court will not abide the Trust's attempted *de facto* amendment of that pleading in its opposition to a motion to dismiss. The court will dismiss Counts I and IV–V.[17]

---

14. DCHC was incorporated in Delaware. Accordingly, the fiduciary duties of its officers and directors are defined by the laws of that jurisdiction. *See Pagonis v. Donnelly*, 929 F.Supp. 459, 460 (D.D.C.1995).

15. The Trust might have avoided this pleading defect had it alleged in the Complaint that (1) the D & O Defendants could have stopped the NCFE Entities from loaning money to DCHC's subsidiary corporations and chose to allow the loans, (2) they knew or should have known that further loans from the NCFE Entities would harm DCHC in particular (which would be difficult to allege if each subsidiary was insolvent at the time of each loan), and (3) their failure to act proximately caused injury to DCHC itself. But the Complaint does not say this. It merely says that the D & O Defendants breached their fiduciary obligations to "the Debtors" by allowing NCFE to extend more credit to DCHC's subsidiary entities without ever explaining which of "the Debtors" were harmed. (Compl. at ¶¶ 179–80, 206–07, 217). These allegations are too vague to give any defendant proper notice of the basis for the Trust's claims.

16. While the court could take judicial notice of the Disclosure Statement, that would not resolve the Trust's predicament. "The bankruptcy court may take judicial notice of its own records, but may not infer the truth of facts contained in documents[ ] simply because such documents were filed with the

court." *In re H. King & Assoc.*, 295 B.R. 246, 261 (Bankr.N.D.Ill.2003); *see also In re MCorp Fin., Inc.*, 137 B.R. 219, 229 (Bankr. S.D.Tex.1992).

17. The closest the Trust comes to properly alleging a breach of fiduciary duty claim with respect to financing by the NCFE Entities is found in paragraphs 103 and 124 of the Complaint. In those paragraphs, the Trust alleges that the D & O Defendants allowed the NCFE Entities to "dominate and control DCHC," (Compl.¶ 124), and that as a result of this domination DCHC purchased Greater Southeast Hospital "if, when[,] and as" the NCFE Entities desired, (*id.*), using loans from the NCFE Entities to do so. (Compl.¶ 103). The problem with supporting a breach of fiduciary duty claim here, however, is that the Trust fails to allege in good faith that Greater Southeast was not worth its purchase price. Unlike the loans made by the NCFE Entities that were (under)secured by the Debtors' accounts receivables, which the Debtors could not repay (thus prolonging the Debtors' existence and increasing their insolvency), the loan for Greater Southeast could always be repaid through a sale of that property assuming that Greater Southeast was worth its purchase price. As there is no clear allegation in the Complaint that the NCFE Entities inflated the value of Greater Southeast prior to DCHC's purchase, the loan made by NCFE towards that purchase cannot be construed as deepening DCHC's insolvency.

### (b) Claims alleging "corporate waste"

■■■ Counts V–IX of the Complaint allege that the D & O Defendants breached their fiduciary duties to DCHC by engaging in "corporate waste." This theory of fiduciary breach refers to "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.'" *White v. Panic,* 783 A.2d 543, 554 (Del.2001) (quoting *Brehm v. Eisner,* 746 A.2d 244, 263 (Del. Supr.2000)). "To prevail on a waste claim ..., the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *Id.* at 554 n. 36. "[T]he decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 238 (3d Cir.2005).

■■■ Claims alleging waste are "extremely difficult [ones] to prove," *Telxon Corp. v. Bogomolny,* 792 A.2d 964, 975 (Del.Ch.2001), because "[i]f it can be said that ordinary businessmen might differ on the sufficiency of the terms, then the court must validate the transaction." *Saxe v. Brady,* 184 A.2d 602, 610 (Del.Ch.1962).

"[A]ny *substantial* consideration received by the corporation" suffices to defeat the claim. *Brehm,* 746 A.2d at 263 (emphasis in original). One Delaware court has even described waste as the "Nessie"[18] of fiduciary duty claims because it so rarely occurs "in the world of real transactions." *Steiner v. Meyerson,* 1995 WL 441999, *4–5 (Del.Ch. July 19, 1995). Nonetheless, courts applying Delaware law have on several occasions permitted claims for waste to proceed at least to the discovery phase. *See, e.g., In re Tower Air, Inc.,* 416 F.3d at 241 (plaintiff presented colorable waste claim where complaint alleged that directors of airline created unprofitable route "purely to please" officer's family); *Meiselman v. Eberstadt,* 170 A.2d 720, 721–23 (Del.Ch.1961) (resolving waste claim based on alleged excessive compensation as a factual matter).

■■■ Counts V–VII and IX of the Complaint do not warrant such consideration. Essentially, each of these counts alleges that DCHC (or "the Debtors" collectively) spent more money than it (or they) should have, whether it be by approving lending agreements with high interest rates (Compl.¶¶ 212–215), using a charter flight service instead of commercial air lines (Compl.¶¶ 222–224), paying DCHC's president and vice-president too much money (Compl.¶¶ 231–234),[19] or spending too

---

18. The reference is to the creature believed by many to reside at the bottom of Loch Ness outside Inverness, Scotland. Believers theorize that the lake plays host to a remnant plesiosaur from the Mesozoic Era. Other explanations for sightings of the monster include unusual wave patterns, bubbles released by volcanic activity at the base of the lake, abnormally large seals or sturgeon, pareidolia, or intentional hoaxes. While many claim to have seen the bashful beast, no one has yet caught it. *See generally* Ronald Binns, THE LOCH NESS MYSTERY SOLVED (Star Books 1984).

19. Count VII of the Complaint, alleging "excessive executive compensation," is somewhat misleading in that it counts as part of their compensation the loans to Paul Tuft and Melvin Redman that were forgiven by DCHC and compares their total compensation (unfavorably) to the average annual income for the top two officials of 13 hospital holding companies surveyed by the Trust. (Compl.¶¶ 232–234). While perhaps not objectionable in and of itself, the Trust's *separate* waste claim for those very same loans in Count VIII of the Complaint renders its inclusion of those loans as "income" in Count VII an exercise in double-counting. Without the forgiven loans, Paul Tuft received (according to the Trust's

much on corporate overhead. More importantly, the Complaint does *not* allege that DCHC received little or no consideration for these bargains, that the counterparties to these transactions failed to perform their end of the bargain, or that the transactions were made solely to benefit the individual directors and officers.[20] The court will not second-guess the business judgments of the D & O Debtors merely because the terms of certain deals were not, in hindsight, "fair" to DCHC. (Compl.¶ 215). Counts V–VII and IX will be dismissed.

■ Count VIII of the Complaint is a different story. In that count, the Trust alleges that DCHC made loans to Paul Tuft, Melvin Redman, and Steven Dietlin totaling $5.5 million that were subsequently forgiven for no consideration and were not required as part of the officers' employment agreements. Moreover, at least with respect to Paul Tuft, these loans were made to finance highly personal interests such as a divorce settlement, the purchase of a house and a car, and a gift to the University of the District of Columbia. (Compl.¶¶ 242–246).

The court cannot fathom why DCHC would simply give away millions of dollars to its officers without receiving *anything* in return. While the Defendants may be able to produce evidence of extenuating circumstances justifying DCHC's apparent charity, nothing in the Complaint gives this court any reason to conclude that a reasonable businessperson would approve of DCHC's practice in this regard. Count VIII will not be dismissed for failing to allege corporate waste. The court next turns to whether Count VIII (and also Count II) may be dismissed as to individual D & O Defendants on other grounds.

2. *Arguments raised by individual D & O Defendants*

(a) *Arguments raised by DCHC officers*

The D & O Defendants also urge dismissal of Counts II and VIII with respect to DCHC officers Erich Mounce, Susan Engelhard, Donna Talbot, Steve Dietlin, and Paul Tuft (in his capacity as an officer of DCHC) because the Complaint does not link those individual defendants in any way to the acts alleged in those counts.[21] To recap, Count II alleges breach of fiduciary

numbers) approximately $2.6 million from 1999–2000, an average salary of $650,000 per year. Melvin Redman received $1.45 million during that same time span, an average of $362,500 per year. These averages are actually *lower* than the industry averages cited by the Trust.

20. Count VI of the Complaint, alleging corporate waste through the use of chartered airplanes provided by Tuft–Redman Enterprises, presents a closer case than the other counts, though not for the reason propounded by the Trust. The more colorable reason for finding corporate waste relating to Tuft–Redman Enterprises would be DCHC's alleged failure to collect on a loan made to Tuft–Redman Enterprises (a company created and owned by Paul Tuft and Melvin Redman) to enable that company to purchase time share interests in two aircraft. (Compl.¶¶ 162–164). But the Com-

plaint does not indicate *why* DCHC failed to collect on the loan or how much the loan totaled. Absent some indication as to the amount of the loan or good-faith allegation that the loan was not pursued because Paul Tuft and Melvin Redman wanted to maximize their profits from Tuft–Redman Enterprises, the court cannot conclude that the failure to pursue this loan "constituted an [act] to which no reasonable person not acting under compulsion and in good faith could agree." *Telxon Corp.*, 792 A.2d at 976.

21. The D & O Defendants also move to dismiss Counts I and IV–VI with respect to the defendant officers. As the court has already concluded that it must dismiss these counts with respect to *all* Defendants, there is no need to consider the merits of the defendant officers' separate arguments with respect to these claims.

duty in using corporate charter jets instead of commercial air lines, (Compl.¶¶ 186–188), while Count VIII alleges that DCHC's forgiveness of $5.5 million in loans to DCHC executives constituted corporate waste. (Compl.¶¶ 222–224).

The Trust correctly points out that each officer of DCHC owed the same fiduciary duties of care and loyalty to the company as its directors. *See In re the Walt Disney Co.*, 2004 WL 2050138, *3 (Del.Ch. Sept.10, 2004). But the scope of those duties is restricted necessarily to those activities within each officer's control. Unless a specific defendant officer had the power to prevent DCHC from contracting with Tuft Redman Enterprises or forgiving millions of dollars in loans to corporate executives, that officer cannot be held responsible for those actions. Simply being an officer of the company is not enough. *Cf. Continuing Creditors' Comm. of Star Telecomm. Inc. v. Edgecomb*, 385 F.Supp.2d 449, 461–62 (D.Del.2004) ("*Edgecomb*") (dismissing fiduciary breach claims against corporate officers where little more than status as officers was alleged).

The Complaint is devoid of any allegations concerning the roles of Mr. Mounce, Ms. Talbot, and Ms. Engelhard with respect to Counts II and VIII. It states only that Mr. Mounce and Ms. Talbot were vice-presidents of DCHC, (Compl.¶¶ 22–24), and that Ms. Engelhard,

in addition to being a vice-president of DCHC, was also its secretary and "[g]eneral [c]ounsel." (Compl.¶ 24). It does not indicate whether the three officer defendants were responsible for corporate travel arrangements or the issuance or forgiveness of corporate loans. It does not suggest that the defendant officers could have stopped the challenged transactions had they wanted to do so. It simply lumps these defendants in with the (unnamed) officers and directors who *were* responsible for these transactions.[22]

Count VIII presents a closer case for Mr. Tuft and Mr. Dietlin only because the Complaint alleges that these officers were the beneficiaries of DCHC's generous lending practices. (Compl.¶¶ 155–159, 242, 244).[23] But again, there is nothing in the Complaint specifying that either of these officers issued or could have issued the challenged loans (indeed, the Complaint does not even allege sufficient facts to conclude that the issuance of the loan by itself was anything other than "not fair" to DCHC, hardly an actionable offense). More importantly, there is nothing in the Complaint indicating that Mr. Tuft or Mr. Dietlin authorized the forgiveness of their own loans or that they had the authority to do so. Without these allegations, Count VIII must be dismissed with respect to Mr. Dietlin and Mr. Tuft (in his capacity as an officer of DCHC).

In contrast, the allegations made in Count II suffice to state a claim for

---

22. The Trust's reliance on *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), and *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) for the well-established rule that "general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 497 U.S. at 889, 110 S.Ct. 3177 (quoting *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99), is unhelpful here because the Complaint does not even make *general* allegations against the defendant officers.

23. Paragraphs 152 through 154 of the Complaint allege that DCHC forgave $337,321.00 in loans to the other defendant officers, but the Complaint does not discuss these defendants in Count VIII. In any event, the Complaint does not state a claim for waste with respect to these defendants for the same reason that it does not state a claim against Mr. Tuft or Mr. Dietlin—namely, it does not allege that the defendants were responsible for the forgiveness of their own loans.

breach of fiduciary duty against Paul Tuft. Unlike Count VI, which questions the substance of the D & O Defendants' decision to use charter flights (and which is being dismissed for the reasons discussed above), Count II alleges that the D & O Defendants breached their fiduciary duties of care to DCHC by failing to follow proper business practices in good faith in determining to use charter planes provided by Tuft–Redman Enterprises. (Compl.¶¶ 186–188).

Mr. Tuft was the President and CEO of DCHC at the time of these transactions, (Compl.¶ 19), and he was the co-founder and majority owner of Tuft–Redman Enterprises. (Compl.¶¶ 162, 171–72). As alleged in the Complaint, he (along with Mr. Redman) [24] made the decision to use Tuft–Redman Enterprises rather than travel on commercial carriers even though he knew commercial flights were cheaper and without obtaining approval from the board of directors. (Compl.¶¶ 168–169). These allegations may not support a claim for waste, but they do state a claim for breach of the fiduciary duties of care and loyalty to DCHC as an *officer* of DCHC. Count II will be dismissed with respect to Mr. Mounce, Ms. Talbot, Ms. Engelhard, and Mr. Dietlin, but not with respect to Mr. Tuft.

(b) *Arguments raised by the DCHC directors*

■■■ In addition to the claims already dismissed, the defendant directors seek

dismissal of Counts II–III and VIII under the limitation of liability clause in Article VI of the certificate of incorporation for Capital America Healthcare Corporation, the corporate predecessor of DCHC. (D & O Memo. at 20–22; Parrett Memo. at 12–14; Krauss Memo. at 6–7).[25] This clause insulates the directors of the corporation from personal liability except for "(I) any breach of the [d]irector's duty of loyalty to the [c]orporation or its stockholders, [or] (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law . . . ." (D & O Memo. Exh. A).

■■■ All of the remaining counts alleged against the defendant directors are barred by this clause. Counts II and III allege that the D & O Defendants "were grossly negligent" in their failure to "inform themselves of all material information reasonably available to them" concerning DCHC's arrangement with Tuft–Redman Enterprises and its forgiveness of millions of dollars in loans made to DCHC officers. (Compl.¶¶ 188–189, 197–199). Count VIII alleges that the defendants engaged in corporate waste, a form of negligence so extreme that it circumvents the business judgment rule. *See Edgecomb*, 385 F.Supp.2d at 465 (waste claim barred by exculpatory clause statute unless breach of duty of loyalty is also alleged). These are exactly the types of

---

**24.** In addition to the allegations set forth above, the Complaint also alleges that Mr. Redman negotiated the start-up loan to Tuft–Redman Enterprises while he was still an officer and director at DCHC. (Compl.¶ 163). Perhaps not surprisingly, the D & O Defendants do not even attempt to argue that Mr. Redman should be exempt from liability under Count II.

**25.** Contrary to the Trust's contentions, the court can take judicial notice of DCHC's arti-

cles of incorporation in the context of a motion to dismiss under Rule 12(b)(6). *See Kaempe v. Myers*, 367 F.3d 958, 963 (D.C.Cir. 2004); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C.Cir.2000); *see also, e.g., Grassmueck v. Barnett*, 281 F.Supp.2d 1227, 1232 (W.D.Wash.2003) (taking judicial notice of Delaware articles of incorporation in motion to dismiss breach of fiduciary claim because the articles are "certified public records" kept by the Secretary of State).

claims that the immunity clause was designed to prevent. *See Malpiede v. Townson,* 780 A.2d 1075, 1095 (Del.2001) (purpose of exculpatory clause statute was "to permit stockholders to adopt a provision in the certificate of incorporation to free directors of personal liability in damages for due care violations"); *see generally* Dennis J. Connolly, *Second Circuit Says Exculpation Provisions Apply to Trust Claims Against Directors,* 24 AM. BANKR. L.J. at 26 (September 2005) (recounting the history and purpose of exculpation clauses in Delaware certificates of incorporation).[26]

The Trust relies on *Pereira v. Cogan,* 2001 WL 243537 (S.D.N.Y. March 8, 2001) ("*Pereira I* "), *modified by Pereira v. Cogan,* 294 B.R. 449 (S.D.N.Y.2003) ("*Pereira II* "), for the proposition that exculpatory clauses like the one at issue here do not apply to a bankruptcy trustee (whether appointed by statute or created pursuant to a plan of reorganization) because the trustee's suit would inure to the benefit of third-party creditors, not the corporation that agreed to the clause. (D & O Opp. at 33) (citing *Pereira I,* 2001 WL at *11–12). But the Second Circuit reversed *Pereira I* and *Pereira II* on this exact point in *Pereira v. Farace,* 413 F.3d 330 (2d Cir.2005), noting that "[a]lthough corporate officers and directors owe fiduciary duties to creditors when a corporation is insolvent in fact, ... these duties do not expand the circumscribed rights of the *trustee,* who may only assert claims of the bankrupt corporation,

not its creditors." *Id.* at 342 (emphasis in original). Delaware state and federal courts have reached the same conclusion. *See Prod. Res. Group, LLC v. NCT Group, Inc.,* 863 A.2d 772, 792–94 (Del.Ch.2004) ("plain terms" of Delaware statute authorizing exculpation clauses "apply to all claims belonging to the corporation itself, regardless of whether those claims are asserted derivatively by stockholders or by creditors"); *Edgecomb,* 385 F.Supp.2d at 462–64 (barring continuing creditors' committee from recovery for breach of duty of care under *Production Resources Group* ).

Because the Complaint alleges only that Ms. Parrett and Mr. Krauss served as directors of DCHC, Counts II–III and VIII will be dismissed with respect to them in their entirety. Counts III and VIII will also be dismissed with respect to Mr. Tuft, but Count II will not be dismissed in its entirety with respect to him because it alleges breach of fiduciary duties by Mr. Tuft as an officer. While he may be immunized from this claim in his status as a *director,* he is liable for any breach of fiduciary duty relating to his work as an *officer* at DCHC. *See Pereira II,* 294 B.R. at 534.

### C. Claims Against the Law Firm Defendants

Counts XI–XXI of the Complaint are directed towards the Law Firm Defendants. The court has already ruled that Counts XI–XII and XV should be dis-

---

**26.** Theoretically, Mr. Tuft's and Mr. Redman's obvious conflicts of interest with respect to DCHC's contract with Tuft–Redman Enterprise and forgiveness of their own loans makes them "interested" parties subject to actions for breach of the fiduciary duty of loyalty. *See Cede & Co. v. Technicolor,* 634 A.2d 345, 361 (Del.1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and

not shared by the stockholders generally."). But "[t]o allege a breach of the duty of loyalty based on actions or omissions of the [b]oard, the [p]laintiff must 'plead facts demonstrating that a *majority* of a board that approved the transaction in dispute was interested and/or lacked independence.' " *Edgecomb,* 385 F.Supp.2d at 460 (quoting *Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch. 2002)) (emphasis added by the court in *Edgecomb* ). The Complaint does not allege that necessary fact.

missed. (*See* section II.A, *supra* ). Count XIII must also be dismissed because it alleges only that the Law Firm Defendants aided and abetted the D & O Defendants' breach of fiduciary duties with respect to funding from the NCFE Entities and the Complaint does not properly state a claim for breach of fiduciary duty against the D & O Defendants in that regard. (*See* section II.B.1(a), *supra* ). The only remaining counts are for legal malpractice (Count XIV) and fraudulent conveyances (Counts XVI–XXI).

### 1. *Legal malpractice claim (Count XIV)*

▆▆▆ "District of Columbia law requires a legal malpractice plaintiff to establish (1) the existence of an attorney-client relationship; (2) the applicable standard of care; (3) a breach of that standard of care; and (4) a legally cognizable harm." *Belmar v. Garza (In re Belmar)*, 319 B.R. 748, 752–53 (Bankr.D.C.2004); *accord Forti v. Ashcraft & Gerel*, 864 A.2d 133, 138 (D.C. 2004). The Trust alleges that the Law Firm Defendants breached their professional duties of care to the Debtors "by (1) failing to inform the Debtors of the conse-

quences associated with the Debtors' deepening insolvency; and (2) negligently preparing opinion letters that allowed NCFE to perpetuate a Ponzi scheme and overfund the Debtors." (Compl.¶¶ 312–313).[27]

▆▆▆ The Trust's first proffered basis for liability (failure to inform the Debtors of the "consequences" of deepening insolvency) fails as a matter of law because it does not allege a failure of the Law Firm Defendants within the scope of the attorney-client relationship. Although the Complaint properly alleges an attorney-client relationship with the Law Firm Defendants, the scope of that relationship does not include *business* advice given to the Debtors.[28] Rather, the Law Firm Defendants had an obligation to exercise reasonable care only with respect to their *legal* advice. *See Kansas Public Employees Ret. Sys. v. Kutak Rock*, 273 Kan. 481, 44 P.3d 407, 416–18 (2002); 3 R. Mallen & J. Smith, Legal Malpractice § 1.1 (2005 ed.) ("The test to distinguish malpractice from other wrongs is whether the claim primarily concerns the quality of the *legal* services.") (emphasis added).[29]

---

**27.** The Trust alleges elsewhere in the Complaint that "Epstein Becker also failed to close the Greater Southeast transaction in a timely manner, resulting in further liability to the Debtors, as found by this Court," (Compl.¶ 140), but does not allege that Epstein Becker acted negligently or was the proximate cause of the untimely closing. The court is left to wonder whether the Trust simply forgot to expand upon this vague allegation or decided to abandon it. Either way, the allegation is too ambiguous to survive Epstein Becker's motion to dismiss. *See Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard*, 24 F.Supp.2d 66, 73 (D.D.C.1998) ("[L]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.").

**28.** This is an additional ground for dismissing Count XIII to the extent that Count XIII (aiding and abetting breach of fiduciary duty)

rests on the failure of the Law Firm Defendants to inform the Debtors of the consequences associated with the Debtors' deepening insolvency.

**29.** Even assuming that Epstein Becker and Kutak Rock advised the Debtors on business matters on a regular basis, (*see* Compl. ¶¶ 28, 44, 71, 74, 84, 92, 94, 106), that advice was not legal in nature and would not receive the special protections accorded legal advice. *See Boca Investerings P'ship v. U.S.*, 31 F.Supp.2d 9, 11 (D.D.C.1998) ("communications made by and to ... in-house lawyer with respect to business matters, management decisions or business advice are not protected by the [attorney-client] privilege"). An attorney who provides bad business advice, even advice given on retainer, is no more liable for legal malpractice than a doctor who is paid for such advice would be for medical mal-

The Trust attempts to dress up its allegations on this point by connecting them to its deepening insolvency and breach of fiduciary duty claims against the D & O Defendants. But a company's acquisition of additional debt, by itself, is not a legal wrong, and therefore has no "consequences" for the company of a legal nature. And the Complaint, while flush with allegations about the misdeeds of DCHC's directors and officers, does not (1) allege properly any harm to DCHC as a result of the D & O Defendants' purported breaches of fiduciary duty, (2) allege properly that the deepening insolvency of DCHC's subsidiary hospital corporations was caused by breaches of fiduciary duty by the directors and officers of those corporations; or (3) allege properly that the D & O Defendants should be held responsible for the deepening insolvency of the subsidiary hospital corporations. Absent such allegations, there was no foreseeable *legal* harm for the Law Firm Defendants to report.

■ The second basis for liability advanced by the Trust ("negligently preparing opinion letters" (Compl.¶¶ 312–313)) stands on stronger ground. The Complaint states in pertinent part:

> Over the years of representation, Epstein Becker provided a number of legal opinions to NCFE on behalf of the Debtors. The legal opinions were drafted in accordance with NCFE's requests

and, in some cases, were initially drafted by NCFE. The legal opinions allowed NCFE to perpetuate a Ponzi scheme.

> . . .

> At various times during its representation of the Debtors, Kutak Rock prepared opinion letters to facilitate financing through NCFE, including the opinion letters associated with the purchase of Michael Reese. These opinion letters were largely drafted by NCFE. NCFE designed the opinion letters to show to credit reporting agencies so that NCFE could perpetrate a Ponzi scheme.

(Compl.¶¶ 129, 145).

Other paragraphs allege that Epstein Becker authored an opinion letter to NPF X, Inc. (Greater Southeast's primary lender and an NCFE subsidiary) containing assumptions which the author knew to be false. (Compl.¶ 133). Another letter was sent that same day to NPF XII, Inc. and NPFS, Inc. (Compl.¶ 134). These NCFE spin-offs overfunded Greater Southeast, thereby deepening its insolvency. (Compl.¶ 112).

Taken together, these allegations state a claim for legal malpractice. According to the Complaint, the Law Firm Defendants prepared opinion letters in their capacity as attorneys for all of the Debtors, not just DCHC.[30] The Trust alleges that these

---

practice, or, for that matter, an attorney who provides bad medical advice to a client would be for legal malpractice.

**30.** The Complaint alleges that Epstein Becker "advised *DCHC* in a variety of capacities regarding the acquisition of Greater Southeast," (Compl.¶ 106), and that "Kutak Rock advised *DCHC*" concerning the purchase of other hospitals, (Compl.¶¶ 44, 72, 74, 86, 94), but it also alleges that "Epstein Becker has represented DCHC and its predecessors *and affiliates* in a variety of legal and business matters dating back at least to 1994," (Compl.¶ 28),

and that "Kutak Rock has acted as a *de facto* general counsel for DCHC and its predecessors *and affiliates* since the early 1990[s]." (Compl.¶ 29) (all emphasis added). Other parts of the Complaint allege that Epstein Becker "provided legal advice to *the Debtors* for several years," (Compl.¶ 129), that "[o]ver the years of representation, Epstein Becker provided a number of legal opinions to NCFE on behalf of *the Debtors*," (Am.Compl.¶ 130), that "Kutak Rock began providing advice to *the Debtors* in 1992," (Compl.¶ 141), and that "Kutak Rock also provided letters to *the Debtors'* auditors to allow the Debtors to continue

opinions were prepared in a manner incommensurable with the reasonable standard of care employed by a professional attorney, and supports that assertion with specific facts. Finally, it alleges that these opinions allowed the NCFE Entities to perpetuate a Ponzi scheme that required the overfunding of the Debtors, thereby deepening their insolvency. While these allegations are far from precise,[31] they suffice at this stage to allege a claim by the Debtor hospitals for malpractice.

### 2. Fraudulent conveyance claims

■ The Trust also seeks to recover payments made to the Law Firm Defendants under §§ 544 and 548 of the Bankruptcy Code because "[t]he Debtors made the transfer of legal fees to Epstein Becker and Kutak Rock without receiving a reasonable equivalent value." (Compl. ¶¶ 328, 339; see also id. at ¶ 347).[32] These claims are largely duplicative of Count XIV in all but one important respect— fraudulent conveyance actions (at least under § 548) have been held to be immune to the defense of in pari delicto. See McNamara v. PFS (In re Personal & Business Ins. Agency), 334 F.3d 239, 245–247 (3d

Cir.2003) (distinguishing actions brought by a trustee under § 548 from actions under § 541 because § 548 permits a court to consider the appointment of an innocent party (i.e., the trustee)).

■ The Law Firm Defendants do not challenge the Trust's allegations that (1) the Debtors transferred legal fees to the Law Firm Defendants within one year of filing their bankruptcy petition, and (2) that the Debtors were insolvent at the time of that transfer. (Compl.¶¶ 347–348). Rather, they argue strenuously that the fraudulent conveyance counts, which were not in the Complaint as originally drafted, were not raised in a timely manner. The Trust concedes that Counts XVI–XXI were not pled within two years of the Debtors' bankruptcy petition as required by 11 U.S.C. § 546(a)(1)(A), but argues that the claims "relate back" to the earlier filing date of the original Complaint under FED. R. CIV. P. 15(c). Under that rule, a claim asserted for the first time in an amended pleading is deemed to have been pled at the time of the original complaint if "the claim or defense asserted in the amended pleading arose out of the con-

---

to operate and obtain financing." (Compl.¶ 144) (all emphasis added).

**31.** The most troubling aspect of the allegations is that they refer repeatedly to "the Debtors" collectively, without establishing (1) that harms suffered by one debtor harmed the others or (2) that opinion letters prepared by the Law Firm Defendants were written *after* the law firms were retained by the specific debtor harmed by those opinions. Because the Complaint is so unclear on this point, the court would view favorably a motion from the Law Firm Defendants for a more definite statement under FED. R. CIV. P. 12(e). But the allegations as currently written do not necessarily preclude the Trust from succeeding on its malpractice claim; accordingly, the court will not dismiss the claim at this time.

**32.** Under § 548 of the Bankruptcy Code, the trustee may avoid any transfer by the debtor

within one year before the debtor's bankruptcy petition if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation [] ... and was insolvent on the date that such transfer was made or such obligation was incurred ...." 11 U.S.C. § 548(a)(1)(B). Section 544 allows the trustee to invoke the fraudulent transfer laws available to any holder of an unsecured claim allowable under § 502 of the Bankruptcy Code. See 11 U.S.C. § 544(b)(1). The Trust invokes Arizona's Fraudulent Transfer Act, which is identical in most respects to § 548 except that it is not restricted to transfers made within the year prior to the debtor's bankruptcy filing. See Ariz. Rev. St. §§ 44–1004, 44–1005. Section 550 allows the trustee to recover property avoided under sections 544 or 548. See 11 U.S.C. § 550(a).

duct, transaction, or occurrences set forth or attempted to be set forth in the original pleading . . . ."

As the court previously noted, Counts XVI–XXI are premised on the same facts that support the Trust's malpractice claim. The only additional fact pled in the later counts is that the Debtors paid the Law Firm Defendants for their services. To the extent this "new" fact could not have been inferred from the original complaint, it merely "build[s] on previously alleged facts [that] relate back to the original complaint." *Purcell v. MWI Corp.*, 254 F.Supp.2d 69, 75 (D.D.C.2003). The court concludes that Count XVI–XXI were pled in a timely manner under Rule 15(c).

■■■ Kutak Rock argues that its legal fees must be presumed to have been "reasonable equivalent value" for its work because the Trust does not allege that its fees were excessive or that it failed to perform the work billed. (KR Memo. at 17–18).[33] It cites *Lawrence v. Bonadio, Insero & Co. (In re Interco Sys., Inc.)*, 202 B.R. 188 (Bankr.W.D.N.Y.1996), for the proposition that "the payment of professional fees or expenses to professionals or others who perform the services or provided the goods at the request of the corporation and charged a reasonable rate is not avoidable as a fraudulent conveyance under [s]ection 548(a)(2)(B)(i) . . . ." *Id.* at 194 (quoted in KR Memo. at 17). But that is not all that *Interco* says. On the same page quoted by Kutak Rock, the court clarifies that

> Certainly, if the facts and circumstances indicate that a payment of professional

fees or other expenses by a corporation was for services or goods which solely benefitted a third party, *whether it be a principal, officer or employee,* and had no reasonable, good faith business judgment benefit to the corporation, that payment would be avoidable under [s]ection 548 because of a lack of reasonably equivalent value . . . .

*Id.* (emphasis added), *cf. Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.)*, 136 B.R. 1008, 1021 (D.Colo.1990) (granting avoidance of payment to law firm where part of payment was for work actually performed for individual directors of debtor rather than debtor itself).

■■■ The Complaint is replete with allegations that the Law Firm Defendants engaged in practices, including preparation of negligent or fraudulent opinion letters, that benefitted only the NCFE Entities and (indirectly) the Defendants. (*See* section II.C.1, *supra* ). It strains credulity to suggest that the Debtors received *any* value, let alone "reasonably equivalent" value, for services that were performed so poorly as to rise to the level of a breach of professional duty. The court declines to adopt a *per se* rule insulating law firms that have engaged in malpractice from avoidance actions.

### 3. Res judicata and judicial estoppel

■■■ The Law Firm Defendants argue that the Trust is barred from bringing any action against them under the doctrines of *res judicata* and judicial estoppel. *Res judicata,* or claim preclusion, "prevents parties from relitigating issues they raised or could have raised in a prior

---

**33.** In addition, Kutak Rock argues that Counts XVI–XXI are not pled with the specificity required by Federal Rule of Civil Procedure 9(b). But the Trust alleges constructive, not actual, fraud in the transfer of legal fees, and "[t]he pleading of constructive fraud, as opposed to actual fraud, must only comply with Rule 8(a) because scienter is not an element . . . ." *Sec. Inv. Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr.S.D.N.Y.1999). In any event, the allegations supporting Count XIV, which are incorporated by the Trust into its fraudulent conveyance counts, satisfy either standard.

action on the same claim." *NextWave Personal Communications Inc. v. FCC,* 254 F.3d 130, 143 (D.C.Cir.2001). "The three elements of *res judicata* are: (I) a final judgment on the merits in the first action; (ii) the present claim is the same as a claim that was raised or that might have been raised in the first proceeding; and (iii) the party against whom *res judicata* is asserted was a party or in privity with a party in the previous case." *Jacobsen v. Oliver,* 201 F.Supp.2d 93, 102–03 (D.D.C.2002) (citing *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). An order confirming a plan of reorganization is a "final judgment" for purposes of *res judicata. See FDIC v. O'Donnell,* 136 B.R. 585, 588 (D.D.C.1991).

■ The Law Firm Defendants contend that this court's order confirming the Debtor's Plan bars the Trust's suit because it resolved conclusively any claims that were raised or could have been raised between the parties. (KR Memo. at 40–42; EBG Memo. at 43–52). They claim that under *Browning v. Levy,* 283 F.3d 761 (6th Cir.2002), and *D & K Properties Crystal Lake v. Mut. Life Ins. Co. of N.Y.,* 112 F.3d 257 (7th Cir.1997), the Plan's reservation of rights clause, which specifically mentions possible actions against the Law Firm Defendants, is too vague to be enforced.[34]

Unlike the clause at issue here, *Browning* and *D & K Properties* concerned blanket reservation of rights clauses that did not even name potential defendants. But even if these cases were on point, the court would not follow them because it finds the reasoning animating those decisions to be flawed. The *Browning* court reasoned that it could not honor a blanket reservation clause in a plan "because it did not enable the value of [the debtor's] claims to be taken into account in the disposition of the debtor's estate," *Browning,* 283 F.3d at 775–76, while the *D & K Properties* court refused honor a blanket reservation clause because "[t]o hold otherwise would eviscerate the finality of a bankruptcy plan containing such a reservation." *D & K Properties Crystal Lake,* 112 F.3d at 261. But as numerous bankruptcy courts have pointed out, it would be far more onerous and detrimental to the confirmation process to require "a specific description of every claim the debtor intends to pursue." *Katz v. I.A. Alliance Corp. (In re I Appel Corp.),* 300 B.R. 564, 569 (S.D.N.Y.2003) (noting that such a rule "could entail months or years of investigation and a corresponding delay in the confirmation of the plan of reorganization"); *accord In re Worldwide Direct, Inc.,* 280 B.R. 819, 823 (Bankr.D.Del.2002); *In re Weidel,* 208 B.R. 848, 851–54 (Bankr.M.D.N.C.1997).

■ Moreover, any party-in-interest concerned about "hidden" claims can object to the language in reservation of rights clause *before* confirmation or invoke the doctrine of judicial estoppel should the debtor mislead creditors in any way. Indeed, a creditor's failure to challenge a plan's reservation of rights clause at that time is itself binding under *res judicata* and § 1141 of the Bankruptcy Code. *See* 11 U.S.C. § 1141(a) (provisions of con-

---

**34.** Although the Trust does not raise the point, the court fails to see how Kutak Rock is entitled to raise the defense of *res judicata* at all as it was not a party in interest with respect to the Plan. *See LJM2 Co–Investment, L.P. v. Dodson (In re LJM2 Co–Investment, L.P.),* 327 B.R. 786, 792 (Bankr.N.D.Tex. 2005) (*res judicata* does not apply where party asserting the defense was not a party-in-interest to confirmation of the plan of reorganization). The only objection Kutak Rock could make is if the Plan provisions did not confer upon the Trust the right to prosecute any claims against Kutak Rock. But the provisions of the Plan clearly did create such rights for the Trust. (Plan §§ 1.50, 1.53, 6.6(c)).

firmed plan of reorganization "bind ... any creditor ... whether or not such creditor ... has accepted the plan"); *In re Weidel,* 208 B.R. 848, 852–53 (Bankr. M.D.N.C.1997) (creditor is bound under § 1141(a) to follow retention of rights provision in plan even if provision is vague). For all these reasons, the court declines to accept the unduly strict reading of the *Browning* and *D & K Properties* courts.

The Law Firm Defendants also argue that the Trust is barred from raising any claims against them under the doctrine of judicial estoppel. "Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich,* 530 U.S. 211, 228 n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). The purpose of the rule is "to protect the integrity of the judicial process ... by prohibiting parties from deliberately changing positions according to the exigencies of the moment[.]" *New Hampshire v. Maine,* 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotations and citations omitted). "[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion." *Id.* (internal quotation and citation omitted).

The Law Firm Defendants argue that the Trust should be judicially estopped from asserting claims against them because the Trust (or, more precisely, its predecessor in interest) (1) knew of its claims and failed to disclose them accurately and specifically; and (2) concealed the nature and scope of the claims so as to secure support for confirmation from creditors that would not benefit from the Trust's distributions. This may turn out to be the case, but there is nothing in the

Complaint that supports these allegations. *See U.S. v. Martin–Baker Aircraft Co.,* 389 F.3d 1251, 1261 (D.C.Cir.2004) (court's inquiry is limited to "the allegations in the complaint"). The argument is not ripe on a motion to dismiss under Rule 12(b)(6).

### D. *Affirmative Defenses Common to All Defendants*

Finally, all of the Defendants assert that (1) the Trust's claims are untimely under the applicable statute of limitations; and (2) the Trust's claims are barred in their entirety by the doctrine of *in pari delicto.* The court considers each defense in turn.

### 1. *Statute of limitations*

Under District of Columbia law, claims for breach of fiduciary duty and for legal malpractice must be raised within three years of the victims's discovery of the breach. D.C.Code Ann. § 12–301(8) (2001). A bankruptcy trustee is granted an additional two years from the filing of the bankruptcy petition in which to raise a claim on behalf of the estate assuming that the statute of limitations did not expire prior to the petition. *See* 11 U.S.C. § 108(a); *Rothenberg v. Ralph D. Kaiser Co. (In re Rothenberg),* 173 B.R. 4, 11 (Bankr.D.D.C.1994). The Trust alleges that Epstein Becker prepared negligent opinion papers as late as December 30, 1999 (it does not specify a time with respect to Kutak Rock), and Count II of the Complaint alleges wrongful conduct by Paul Tuft beginning in July of 2001, so the claims were still viable to some degree on the Debtors' petition date. The only question is whether they remained viable for another two years under § 108(a).[35]

Section 108(a) states:

---

35. The Trust also claims that the statute of limitations was tolled in this case by the "continuous misrepresentation" rule. (LF Opp. at 63–64). The court declines to rule on that issue because the only allegations of impropriety that state a claim for malpractice fall

(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

11 U.S.C. § 108(a).

 "[T]he purpose of the two year extension granted by section 108 is to preserve the interests of the debtor's estate." *Natco Indus., Inc. v. Fed. Ins. Co.,* 69 B.R. 418, 419 (S.D.N.Y.1987). The extension applies not only to the trustee, but also to a debtor-in-possession pursuant to 11 U.S.C. § 1107(a). *See In re Rothenberg,* 173 B.R. at 11 (collecting cases). Courts have also concluded that other estate representatives can invoke the protections of § 108(a). *See, e.g., Coliseum Cartage Co. v. Rubbermaid Statesville, Inc.,* 975 F.2d 1022, 1025 (4th Cir.1992) (agents of both trustees and debtors-in-possession can invoke § 108(a)); *Official Comm. of Creditors of Corell Steel v. Fishbein & Co., P.C.,* 1992 WL 196768, *3 & n. 6 (E.D.Pa. Aug.10, 1992) (creditors' committee can invoke § 108(a) where it is "standing in the shoes" of the debtor); *Rudin v. Tax Comm'n of City of N.Y. (In re Olympia & York Maiden Lane Co., LLC),* 233 B.R. 662, 666–67 (Bankr.S.D.N.Y.1999) (state

court equity receiver appointed pre-petition could invoke § 108(a)).

 Epstein Becker urges this court to limit the applicability of § 108(a) to statutory trustees and debtors-in-possession under a "plain language" analysis of the section. The court is mindful that "Congress 'says in a statute what it means and means in a statute what it says there ....' " *Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (quoting *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). But the court also knows that "statutory construction is a holistic endeavor," *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 330 F.3d 548, 559 (3d Cir.2003) ("*Cybergenics*") (quoting *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)), and that "bankruptcy courts are equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings." *Id.* at 567.

 With these principles in mind, there can be little doubt that "[t]his is one of those rare instances in which it is appropriate to reject a *literal* application of the statute because it would produce an absurd result that is demonstrably at odds with the general intent of Congress ...." *In re Shin,* 306 B.R. 397, 410 (Bankr. D.D.C.2004).[36] Section 108(a)'s mandate is to "preserve the interests of the debtor's estate." *Natco Indus., Inc.,* 69 B.R. at

within the three-year window prior to the Debtor's bankruptcy petition and the court concludes, for the reasons set forth below, that the Trust may invoke § 108(a) as a representative of the estate.

**36.** *Cf. United States v. River Coal Co., Inc.,* 748 F.2d 1103, 1107 (6th Cir.1984) (although

post-petition interest "did not accrue 'within three years preceding bankruptcy,' a condition of nondischargeability under § 17 of the [Bankruptcy] Act," such interest was nevertheless nondischargeable as the underlying tax itself was nondischargeable).

419. In this case, by virtue of the Debtors' Plan, the Trust succeeded to the powers of a trustee or debtor-in-possession. Nothing in § 108(a) suggests that the Trust cannot "stand in" for the debtor-in-possession or trustee where under that provision the Trust stands in for the trustee regarding the pursuit of claims of the estate that are the subject of § 108(a). *See Cybergenics*, 330 F.3d at 558 (permitting creditors' committee to file derivative suit under § 544(b) of the Bankruptcy Code at least in part because suit was brought in the name of reluctant trustee for the benefit of the entire estate, not by one specific creditor for that creditor).

Statutes ought to be interpreted in a manner that avoids absurd results. It makes no sense that an estate's state law claims could have been pursued by "the trustee" by virtue of § 108(a) until the fall of 2004 but that this power disappeared into the ether when these same claims vested in a liquidating trust pursuant to 11 U.S.C. § 1123(b)(3)(B) as successor to the trustee under a plan confirmed in the spring of 2004. When § 108(a) refers to "the trustee['s]" pursuit of claims, it only makes sense to view that provision as entailing a successor to the trustee's power to pursue such claims to benefit creditors. In other words, § 108(a) ought to apply when there has been a confirmed plan vesting identified claims in a successor who is acting at the behest of creditors (or who is a successor by reason of a negotiated acquisition of such claims from the estate as part of the confirmed plan, which the creditors were able to evaluate with respect to the benefits conferred upon them).[37]

The Law Firm Defendants also argue that (1) all of the property of the estate revested in the Debtors when the Plan went into effect on April 4, 2004, thus foreclosing any future use of § 108(a) by the Reorganized Debtors, and that (2) the Trust, as an assignee of the Reorganized Debtors, cannot invoke § 108(a) any more than the Reorganized Debtors could. Their position is buttressed by a line of cases holding that "[w]hile a debtor-in-possession is entitled to § 108's tolling period, ... a [reorganized] debtor is not," *Cunningham v. Healthco, Inc.*, 824 F.2d 1448, 1460 (5th Cir.1987), because reorganized debtors "are not subject to the control of the bankruptcy court and are not fiduciaries of their creditors." *Natco Indus., Inc.*, 69 B.R. at 419; *see also U.S. Am. Bank v. C.I.T. Constr. Inc. of Tex.*, 944 F.2d 253, 259–60 (5th Cir.1991) (barring creditor from invoking § 108(a) because the creditor brought the suit "solely to advantage itself").

The court does not find the reasoning behind these cases to be entirely persuasive. The premise of their holdings is that a reorganized debtor's claims cannot benefit the creditors of the former debtor-in-possession once those creditors' claims against the estate are discharged. *See C.I.T. Constr. Inc. of Texas*, 944 F.2d at

---

**37.** A different result is justified when a case is dismissed. Upon dismissal, claims of the estate re-vest in the debtor unless otherwise ordered. 11 U.S.C. § 349(b)(3). However, such a debtor does not obtain the claims by reason of a confirmed plan that identified such claims and was designed to confer a benefit on creditors by virtue of the claims' continued pursuit. The trustee's avoidance powers (which are analogous to the trustee's rights under § 108(a), and which could be vested in a liquidating trust under a plan pursuant to § 1123(b)(3)(B)) disappear upon a dismissal (and, unless the court orders otherwise for cause, transfers avoided are reinstated under § 349(b)(1) and judgments under § 550 to recover avoided transfers are vacated under § 349(b)(2)). A debtor in a dismissed case, in other words, is not treated as a successor to a trustee's pursuit of claims of the estate for the benefit of creditors.

260 ("Post-confirmation debtors are not entitled to the tolling provisions of § 108(a) because their interests diverge from those of the creditors of the bankruptcy estate."). But a discharge is granted only where there is payment under a plan of reorganization, and creditors of the debtor-in-possession can demand a higher payment based on the ability of the reorganized debtor to recover assets post-confirmation. In this respect, even a reorganized debtor's claims can be said to benefit her former creditors because those claims increase the leverage of the debtor's creditors in negotiating plan payments.[38]

Even if the court were to accept the reasoning of the courts in *C.I.T. Construction, Cunningham,* and *Natco Industries,* the rule laid out in those cases actually cuts against the position taken by the Law Firm Defendants. Under § 1141(b) of the Bankruptcy Code, *"[e]xcept as otherwise provided* in the plan [of reorganization] or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1141(b) (emphasis added). As the *C.I.T. Construction* court explained:

> If the reorganization plan or confirmation order places the debtor's recovery under the control of the bankruptcy court, ... [courts] have characterized the debtor as a "debtor-in-possession" for the purposes of § 108, which means the debtor acts for the benefit of all creditors of the estate and thus benefits from the application of § 108(a).

944 F.2d at 260 n. 11.

For example, the Fifth Circuit held in *Cunningham* that a post-confirmation debtor could still invoke the protections of § 108(a) as a debtor-in-possession where

the debtor's plan provided that half of any recovery from the debtor's litigation against the defendant would be transferred to the plan's disbursing agent because "[h]aving been expressly addressed in the plan, any recoveries under the causes of action remain[ed] under the supervision of the bankruptcy court." 824 F.2d at 1460. In contrast, the district court in *Natco Industries* held that § 108(a) was not available to a reorganized debtor whose plan did not contemplate post-confirmation litigation because the debtor "would reap the benefit of a provision designed to preserve the estate as a whole pending bankruptcy proceedings." 69 B.R. at 420. The basic principle underlying all of these decisions is that the protections of § 108(a) cease to exist only when "any recovery by [the debtor] ... would vest solely in [the debtor]." *C.I.T. Constr. Inc. of Tex.,* 944 F.2d at 260.

Unquestionably, the Debtors would still be considered debtors-in-possession under *Cunningham* if the Plan had directed *them* to prosecute all unliquidated causes of action held by the estate and then transfer the proceeds from the liquidation of their claims to their creditors. *See Cunningham,* 824 F.2d at 1460 (because "confirmation of the reorganization plan did not vest [the debtors] with title to its causes of action, [the debtors were] still [ ]['']debtor[s]-in-possession,['] and therefore [were] entitled to the tolling provision of § 108"). Instead, the Plan created a new entity, the Trust, to prosecute and disburse unliquidated claims of the estate. The Trust, as successor representative of the estate, stands in the shoes of the debtor-in-possession who, in turn, stands in the shoes of the trustee under 11 U.S.C.

---

**38.** Conceivably, a debtor could conceal certain potential claims from her creditors and then assert them post-confirmation. But as noted above, a reorganized debtor would not be able to assert a claim that was intentionally "hidden" from her creditors under the doctrine of judicial estoppel. *See* section II.C.2, *supra.*

§ 1107. As such, it is subject to the same defenses that are applicable to a bankruptcy trustee and is governed by the same statute of limitations provisions, including § 108(a).

Epstein Becker offers an alternative explanation for the authority of the Trust that would render § 108(a) inoperative. In its view, the Debtor was fully re-vested on the effective date of the Plan, thereby foreclosing further protection under § 108(a), and then assigned certain claims to a third-party entity (the Trust) whose beneficiaries happened to be the Debtors' former creditors. Assuming *arguendo* that this theory was accurate, the Trust, as a contractual assignee of the fully-vested and reorganized Debtors, would have no right to additional time under § 108(a).[39]

But that is *not* what happened here. The Debtors transferred the Liquidating Trust Assets to the Trust because they were required to do so under the terms of the Plan. (D.E. No. 1636 at ¶ 4). And the transferee of those assets was not some third-party stranger to the proceedings; rather, it was a "representative of the estate" under 11 U.S.C. § 1123(b)(3)(B) with the right to retain and enforce the claims of the estate only as delineated in the Plan. *See Guttman v. Martin (In re Railworks Corp.)*, 325 B.R. 709, 719 (Bankr.D.Md.2005) (litigation trust had standing under § 1123(b)(3) to prosecute avoidance claim post-petition). In short, every aspect of the Debtor's arrangement with the Trust was a result of Plan provisions designed to benefit the Debtors' creditors rather than the Debtors themselves.

The only reason that the Debtors cannot invoke § 108(a) is because the Plan bifurcated the assets and debts of the estate through the creation of the Trust. Epstein Becker would essentially punish certain unsatisfied creditors of the Debtors for receiving distributions from a liquidating trust instead of the Debtors themselves. As a representative of the estate, the Trust may rely on § 108(a).

### 2. *In pari delicto*

■ Finally, the Law Firm Defendants argue at length that all claims against them must be dismissed under the doctrine of *in pari delicto*. The D & O Defendants also reference the defense, albeit in a footnote. (D & O Memo. at 17 n. 14). "The doctrine of *in pari delicto* provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." *Lafferty*, 267 F.3d at 354. According to the Law Firm Defendants, the doctrine applies in this case because the Complaint alleges that the DCHC directors and officers knew about and actually solicited the Law Firm Defendants' alleged malpractice and, as corporate fiduciaries, the directors' and officers' knowledge is imputed to the company itself. (Kutak Rock Memo. at 22–23; EBG Memo. at 12–15).

■ While the court is not obligated to consider the D & O Defendants' perfunctory argument at all because it was raised in a footnote, it can dispense with the argument on the merits easily enough. Simply put, fiduciaries like the D & O Defendants cannot assert the *in pari delicto* defense against claims for breach of fiduciary duty. *See In re HealthSouth Corp. Shareholders*

---

**39.** Epstein Becker does not suggest that the duality of identities with respect to the Debtors' former creditors and the Trust's beneficiaries was coincidence, but rather argues that the former creditors chose to forego their rights as creditors in exchange for confirmation of the Plan and a guaranteed pay-out from the Trust. Epstein Becker argues that it seeks only to hold those former creditors to the terms of their "bargain."

*Litig.*, 845 A.2d 1096, 1107–08 & n. 20 (Del.Ch.2003) (collecting cases).

■ As for the Law Firm Defendants, their arguments are properly raised but premature. They presume that the directors and officers of DCHC were also fiduciaries of DCHC's subsidiary hospitals, an assumption not supported by any allegations in the Complaint. While the Law Firm Defendants might be able to show at trial or on a motion for summary judgment that the DCHC directors and officers owed such duties under a veil-piercing analysis, they cannot succeed on such a claim at this stage in the proceeding. *See Martin–Baker Aircraft Co.*, 389 F.3d at 1261. At most, the Law Firm Defendants might be able to assert the defense of *in pari delicto* with respect to claims arising from damages to DCHC, but, as set forth above, the Trust does not allege properly any such claim. (*See* note 10, *supra*). The Law Firm Defendants cannot succeed on their *in pari delicto* defense at this time.

### III

For the foregoing reasons, the court concludes that it must grant in part and deny in part the motions to dismiss filed by the Defendants. With respect to the D & O Defendants, the court will dismiss all counts against all of the defendants with the exception of Count II, which may be asserted against Paul Tuft and Melvin Redman in their capacities as officers of DCHC. With respect to the Law Firm Defendants, the court will dismiss all counts except for Count XIV insofar as it alleges malpractice based on the Law Firm Defendants' negligent preparation of opinion letters used by the NCFE Entities to overfund the Debtors and Counts XVI–XXI, which state claims for fraudulent conveyances under federal and Arizona state law. The deepening insolvency and strong-arm counts (Counts X–XII and XV) will be dismissed in their entirety, with no leave to amend.

As to the remaining counts being dismissed, the court recognizes that many of the conclusions reached in this Opinion with respect to both the claims of the Trust and the affirmative defenses of the Defendants turn on specific defects in the Complaint that could be remedied through further amendment. The court also recognizes that the Trust amended its complaint before the D & O Defendants filed their motion to dismiss, and thus has not had an opportunity to amend the Complaint in response to the specific objections raised by those defendants. The court will therefore give the Trust an opportunity to amend its Complaint with respect to its allegations concerning the D & O Defendants.[40]

Finally, the court recognizes that the Law Firm Defendants in particular may not be able to answer fully the allegations in the Complaint regarding the opinion letters prepared by Epstein Becker and Kutak Rock (the second prong of Count XIV) until a more definite statement is given. For that reason, and because

---

**40.** Regarding the Law Firm Defendants, the court is dismissing Count XIII (regarding aiding and abetting breach of fiduciary duty) because no breach of fiduciary duty by the D & O Defendants has yet been pled. Similarly, the court is dismissing the first prong of Count XIV (legal malpractice for "failing to inform the Debtors of the consequences associated with the Debtors' deepening insolvency") for failure to allege an identifiable *legal* harm which it would have been the responsibility of the Law Firm Defendants to report pursuant to *legal* services incident to their attorney-client relationship. The court will allow the plaintiff to incorporate in Counts XIII and XIV any new allegations against the D & O Defendants that would remove those bases for the dismissal of Count XIII and the first prong of Count XIV.

amendments as to the D & O Defendants may necessitate a new response by the Law Firm Defendants as to Count XIII and the first prong of Count XIV, the court will grant the Law Firm Defendants an opportunity to file a motion for a more definite statement under FED. R. CIV. P. 12(e) before they are required to respond to the allegations regarding the second prong of Count XIV of the Complaint.[41]

An order follows.

---

**41.** In this regard, the Complaint alleges that the Law Firm Defendants prepared opinion letters, but does not say that *each* opinion letter was negligently prepared. Official Form No. 9 (Complaint for Negligence) to the Federal Rules of Civil Procedure suggests that the Law Firm Defendants are entitled to more exact allegations than those provided by the instant Complaint.